EXHIBIT

A

# STATE OF NORTH CAROLINA

___CATAWBA___ County

File No.
**25 CVS 2595**

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff* Bonnie Alemeta-Christina Tolley, as Administrator of the Estate of Timothy Craig Setzer, Jr. c/o Burts Law, PLLC | |

*Address*
P.O. Box 102

*City, State, Zip*
Newton, NC 28658

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

*Name Of Defendant(s)*
The City of Hickory; Officer Aaron Caine Travis, in his individual and official capacities; Officer Austin Ryan Steele, in his individual and official capacities; and Officer Isam Gamal Shamseldin, in his individual and official capacities

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| City of Hickory | Officer Aaron Caine Travis, in his Individual and Official Capacities |
| c/o City Manager, Warren Wood | 891 Reeps Grove Church Road |
| 76 N Center Street | Vale, NC 28168 |
| Hickory, NC 28601 | |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | *Date Issued* | *Time* | |
|---|---|---|---|
| M. Anthony Burts II | 8-13-25 | 12:47 ☐ AM ☒ PM | |
| Burts Law, PLLC | *Signature* Katie Hoyle | | |
| P.O. Box 102 | | | |
| Newton, NC 28658 | ☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | | |

| ☐ **ENDORSEMENT (ASSESS FEE)** This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|
| | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|
| | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

_____CATAWBA_____ County

In The General Court Of Justice
☐ District   ☒ Superior Court Division

| Name Of Plaintiff | |
|---|---|
| Bonnie Alemeta-Christina Tolley, as Administrator of the Estate of Timothy Craig Setzer, Jr. c/o Burts Law, PLLC | |
| **Address** P.O. Box 102 | **CIVIL SUMMONS** |
| **City, State, Zip** Newton, NC 28658 | ☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE) |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

**Name Of Defendant(s)**
The City of Hickory; Officer Aaron Caine Travis, in his individual and official capacities; Officer Austin Ryan Steele, in his individual and official capacities; and Officer Isam Gamal Shamseldin, in his individual and official capacities

**Date Original Summons Issued**

**Date(s) Subsequent Summons(es) Issued**

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Officer Austin Ryan Steele, in his individual and official capacities 121 Orren Lane Taylorsville, NC 28681 | Officer Isam Gamal Shamseldin, in his individual and official capacities 701 Calico Jack Way Green Cove Springs, FL 32043 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time | |
|---|---|---|---|
| M. Anthony Burts II Burts Law, PLLC P.O. Box 102 Newton, NC 28658 | 8-13-25 | 12:47 ☐ AM ☒ PM | |
| | **Signature** _Katie Hoyle_ | | |
| | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | | |

| ☐ ENDORSEMENT (ASSESS FEE) | Date Of Endorsement | Time |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | **Signature** | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|
| | | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|
| | | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

STATE OF NORTH CAROLINA FILED

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO: 25CVS 2595

2025 AUG 13 P 12:46

BONNIE ALEMETA-CHRISTINA TOLLEY,
as Administrator of the ESTATE OF
TIMOTHY CRAIG SETZER, JR.,

              Plaintiff,

  v.

THE CITY OF HICKORY, Officer AARON
CAINE TRAVIS in his individual and official
capacities, Officer AUSTIN RYAN STEELE
in his individual and official capacities, and
Officer ISAM GAMAL SHAMSELDIN in his
individual and official capacities,

              Defendants.

**COMPLAINT**
**(Jury Trial Demanded)**

COMES NOW Plaintiff Bonnie Alemeta-Christina "Christina" Tolley, as the

Administrator of the Estate of Timothy Craig Setzer, Jr. ("Plaintiff"), by and through the

undersigned counsel, and hereby files this Complaint against Defendants The City of Hickory and

Officers Aaron Caine Travis, Austin Ryan Steele, and Isam Gamal Shamseldin in their individual

and official capacities for violations of 42 U.S.C. § 1983 and state law.

## INTRODUCTION

*The use of deadly force to prevent the escape of all felony suspects,*
*whatever the circumstances, is constitutionally unreasonable. It is not*
*better that all felony suspects die than that they escape. Where the suspect*
*poses no immediate threat to the officer and no threat to others, the harm*
*resulting from failing to apprehend him does not justify the use of deadly*
*force to do so. It is no doubt unfortunate when a suspect who is in sight*
*escapes, but the fact that the police arrive a little late or are a little slower*

1

*afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.*

----- *Justice Byron White, Tennessee v. Garner, 471 U.S. 1 (1985)*

## <u>NATURE OF THE CASE</u>

1. Plaintiff brings this civil rights action to hold the City of Hickory and its sworn police officers accountable for the grossly excessive and unlawful use of deadly force that took the life of Timothy Craig Setzer, Jr. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and under North Carolina law, for violations of Mr. Setzer's clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Decades of clearly established law forbid the use of deadly force against an unarmed, non-threatening, fleeing suspect. Nevertheless, on August 13, 2023, three sworn police officers of the Hickory Police Department, namely Officers Aaron Caine Travis, Austin Ryan Steele, and Isam Gamal Shamseldin, chased an unarmed, non-threatening, and fleeing Timothy Craig Setzer, Jr., into the dark corner of an abandoned parking lot and gunned him down.

3. Officers' own sworn statements, along with body-worn camera footage and other evidence, confirm that none of them saw Mr. Setzer holding a firearm when they opened rapid, successive fire. Officer Travis went further, expressly admitting that he never observed a weapon on Mr. Setzer at any time before firing from the passenger seat of a moving patrol car, approximately 50 to 60 feet away. The only firearm recovered was located nearly nine hours later, roughly 40 or more feet from Mr. Setzer's body near the property's wood line, with no physical or forensic evidence linking it to his possession during the encounter.

2

4. Officers' sworn statements, body-worn camera footage, and Mr. Setzer's autopsy make clear that what occurred was less a lawful use of force and more akin to a firing squad. At the moment Officers Travis, Steele, and Shamseldin opened fire, Mr. Setzer was fleeing with his back turned and posed no objectively identifiable threat. Nonetheless, the Officers unleashed a barrage of over thirty rounds at Mr. Setzer in rapid succession.

5. As a result of the HPD officers' actions, Mr. Setzer sustained multiple gunshot wounds to his posterior, including his back, buttocks, and the backs of his calves, consistent with a man who was fleeing, not confronting officers. A fatal round entered through the top of Mr. Setzer's skull and traveled downward, indicating that officers continued firing as Mr. Setzer was collapsing to the ground. Body-worn camera footage and officers' own statements confirm that the Officers continued to discharge their weapons even after Mr. Setzer was already on the ground, reflecting a conscious and deliberate decision to use deadly force well beyond any moment of perceived threat.

## JURISDICTION, VENUE, & PARTIES

6. The incident, which is the subject of this Complaint, occurred in Hickory, Catawba County, North Carolina. As such, all parties are subject to the jurisdiction of the courts of North Carolina, and Catawba County is the proper venue. Catawba County Superior Court has proper personal and subject matter jurisdiction.

7. At the time of the shooting, Timothy Craig Setzer, Jr. ("Mr. Setzer"), was a citizen of Burke County, North Carolina.

8. At the time of the shooting, Bonnie Alemeta-Christina Tolley was a citizen of Burke County, North Carolina.

3

9. At all times relevant hereto, Plaintiff Bonnie Alemeta-Christina Tolley, Administrator of the Estate of Timothy Craig Setzer, Jr., was the mother of the decedent Mr. Setzer, and a citizen of the United States of America. Plaintiff was duly appointed as Administrator of Mr. Setzer's estate on September 25, 2023 (23E000789).

10. The Hickory Police Department ("HPD") is a municipal law enforcement agency tasked with maintaining public safety and enforcing local and state laws, within the city of Hickory in Catawba County, North Carolina.

11. At all times relevant, Defendant Officer Aaron Caine Travis ("Officer Travis") was a citizen of the United States and, upon information and belief, a resident of Lincoln County, North Carolina.

12. At all times relevant, Officer Travis was acting under color of state law in his capacity as a law enforcement officer employed by the HPD.

13. At all times relevant, Defendant Officer Austin Ryan Steele ("Officer Steele") was a citizen of the United States and, upon information and belief, a resident of Alexander County, North Carolina.

14. At all times relevant, Officer Steele was acting under color of state law in his capacity as a law enforcement officer employed by the HPD.

15. At all times relevant, Defendant Officer Isam Gamal Shamseldin ("Officer Shamseldin") was a citizen of the United States and, upon information and belief, a resident of Caldwell County, North Carolina.

16. At all times relevant, Officer Shamseldin was acting under color of state law in his capacity as a law enforcement officer employed by the HPD.

17. Officers Travis, Steele, and Shamseldin are sued in their individual and official capacities.

4

18. Officers Travis, Steele, and Shamseldin are hereinafter collectively referred to as "Defendant Officers."

19. At all times relevant, Defendant City of Hickory (the "City") is a municipal corporation organized by charter under Chapter 160A of the North Carolina General Statutes. It maintains and operates the HPD. Employees of HPD are employees and agents of the City, which bears legal responsibility under state law for negligent acts and omissions of HPD in the course of their employment. The City is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the Defendant Officers named individually herein.

20. Defendant City was at all times relevant and is a municipal corporation located in Catawba County, North Carolina duly chartered and existing pursuant to the provisions of N.C. Gen. Stat.§ 160A-11 and vested with corporate powers and rights as specified in N.C. Gen. Stat.§ 160A-11, including, but not limited to, the capacity to sue and be sued. At all times relevant, Defendant city acted through its managers and policy makers, including the employees of HPD. As such, the acts, edicts, and practices of said managers and policy makers represent the official policies of Defendant City.

21. Upon information and belief, the City Manager, acting under authority delegated by the City Council, exercised final policymaking authority by reviewing the fatal shooting of Timothy Craig Setzer, Jr. and determining that the officers' actions conformed to the City of Hickory's use-of-force policies and applicable law. This decision, made without imposing discipline or initiating policy changes, constitutes ratification of the officers' conduct, rendering the City liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

5

22. Upon information and belief, the City of Hickory has vested final policymaking authority over officer discipline and use-of-force complaint review in City Manager, pursuant to the City's municipal code and organizational structure.

23. The City Manager is designated as the chief administrator of the city, responsible to the council for administering all municipal affairs placed in their charge by the council, as well as those assigned by the charter or ordinance.

24. This position entails oversight of all city departments, including the Police Department, and the implementation of policies set by the City Council.

25. The Chief of Police is appointed by the city and is authorized to manage the Police Department's operations.

**WAIVER OF GOVERNMENTAL IMMUNITY**

26. At all times relevant to this action, Defendant City of Hickory ("City") had waived governmental and/or sovereign immunity from state-law tort claims pursuant to N.C. Gen. Stat. § 160A-485, either by participation in a local government risk pool or through the purchase of commercial liability insurance that provides indemnification for judgments entered against the City and its agents named in this action.

27. Upon information and belief, to the extent any Defendant contends they are a municipal, governmental, or City-owned, operated, or funded entity—or an employee or agent thereof—such Defendants do not enjoy governmental or sovereign immunity for the acts and omissions described herein.

28. In the alternative, upon information and belief, to the extent any such Defendant might otherwise claim governmental or sovereign immunity, those Defendants waived such immunity, in whole or in part, by purchasing, procuring, obtaining, or maintaining liability

6

insurance (or the functional equivalent thereof, such as participation in a local government risk pool) applicable to the acts and omissions alleged in this Complaint, before, during, or after the events at issue.

29. At all relevant times, the individually-named Defendants were employed by the City as sworn law enforcement officers of the Hickory Police Department, acting within the course and scope of their employment and under color of the laws, statutes, regulations, customs, and practices of the City of Hickory, Catawba County, and the State of North Carolina. Plaintiff sues these Defendants in their official capacities for compensatory damages under state and federal law.

30. The grossly negligent acts and omissions of all Defendants—including their agents, principals, employees, and/or servants—are attributable to the City under the doctrines of non-delegable duty, corporate liability, actual or apparent authority, actual or ostensible agency, and *respondeat superior*, and were a direct and proximate cause of Plaintiff's injuries.

31. Upon information and belief, the City maintains multiple layers of liability coverage applicable to the conduct alleged herein, including but not limited to:

    a. A Law Enforcement Liability Coverage Part issued by The Charter Oak Fire Insurance Company (Travelers), Policy No. ZLP-31N15610-23-PB, with a $3,000,000 aggregate limit and $1,000,000 per wrongful act limit, subject to a $25,000 deductible ; and

    b. An Excess Follow-Form and Umbrella Liability Insurance Policy issued by Travelers Property Casualty Company of America, Policy No. ZUP-51N17149-23-

7

PB, providing $8,000,000 per occurrence and aggregate limits above the underlying Law Enforcement Liability coverage .

*See* **Exhibit A, Insurance Policy Declarations Page.**

32. Upon information and belief, the City also participates in the Interlocal Risk Financing Fund of North Carolina ("IRFFNC"), a local government risk pool, which provides coverage for bodily injury, personal injury, and constitutional torts committed by City employees, including law enforcement officers.

33. By procuring and maintaining the above-described coverage, the City has waived governmental and public-official immunity to the extent of that coverage, including for Plaintiff's state-law causes of action such as assault and battery. *See Fabrikant v. Currituck Cnty.*, 174 N.C. App. 30, 38 (2005); *Paquette v. Cnty. of Durham*, 155 N.C. App. 415, 418 (2002).

34. Upon information and belief, the City of Hickory's liability insurers, including The Charter Oak Fire Insurance Company (Travelers) and Travelers Property Casualty Company of America, were timely placed on notice of Plaintiff's claims and provided with substantial evidence of liability, causation, and damages supporting resolution of Plaintiff's claims within the applicable policy limits.

35. Plaintiff, through counsel, provided all Defendants with an opportunity to resolve and settle all claims against the City of Hickory and its employees for an amount within the applicable liability limits under the above-described policies, thereby affording the insurers, and thus their insureds, a reasonable opportunity to protect their insureds from an excess judgment.

8

36. Despite this opportunity and the possible risk of a verdict exceeding policy limits, the City's insurers failed and refused to tender the full amount of applicable coverage to settle the claims thereby exposing their insureds to personal financial liability.

37. Upon information and belief, such refusal was made without a reasonable basis, and in conscious disregard of a verdict in excess of the policy limits, thereby exposing the individual officers to personal financial liability above the limits of coverage.

38. The insurers' failure and refusal to settle within policy limits is relevant to the waiver of governmental and public-official immunity alleged herein because it demonstrates that the City has procured and maintained liability coverage applicable to the claims in this action.

39. The City of Hickory's applicable insurance policies contain per-occurrence limits that are insufficient to cover the full measure of damages sought. By failing to accept a reasonable policy-limits demand, the insurers have placed the individually-named Defendant Officers at risk of an excess judgment for which they may be personally liable.

## FACTS

### *Events that Occurred on August 13, 2023*

**Dispatch Radio about Suspected Gunfire**

40. Shortly after midnight on August 13, 2023, Hickory Police Department ("HPD") officers were dispatched to reports of gunfire in the vicinity of Hickory Optimist Park.

41. Several HPD officers, including Defendant Officers Steele, Shamseldin, and Travis, responded to the dispatch.

42. While en route, Defendant Officers received an updated report that a "white male in a jacket" was seen near the 700 block of 2nd Avenue SW, Hickory, yelling and walking the wrong way on 2nd Avenue.

9

43. The suspect's description was generic in nature, and at the time HPD Officers were dispatched, they did not possess any specific identifying information, such as the suspect's name, age, or distinguishing features.

44. Officer Steele was the first to arrive in the area. Upon information and belief, he spotted a man matching the description and later identified as the decedent, Mr. Setzer, walking in front of Skeet's Wrecker Company at the corner of 1st Avenue SW and 9th Street SW. Mr. Setzer was reportedly talking to himself at that time.

45. Mr. Setzer did not have a firearm in his hands at the time Officer Steele arrived, nor was Mr. Setzer threatening Officer Steele or others.

46. Officer Steele issued verbal commands for Mr. Setzer to stop and show his hands.

47. Initially, Mr. Setzer complied with commands by raising his hands in the air, clearly indicating that he had no firearm in hand.

48. Despite his initial compliance, Mr. Setzer continued to walk away from Officer Steele. When Officer Steele repeated the command to stop, Mr. Setzer began to flee on foot.

49. Prior to fleeing on foot, Mr. Setzer did not brandish a weapon, make threats, or commit any acts of violence against Officer Steele or others.

**The Chase and Shooting Incident**

50. As Mr. Setzer began to flee, Officer Shamseldin arrived on scene. Officer Shamseldin immediately jumped out of his patrol car, drew his firearm, pointed it at Mr. Setzer, and began chasing Mr. Setzer westbound on 1st Avenue SW, Hickory. Officer Steele joined the chase after Officer Shamseldin began chasing Mr. Setzer.

51. Defendant Officers gave chase without formulating a coordinated plan to de-escalate or contain.

10

52. As Officers Steele and Shamseldin chased Mr. Setzer, Officer Shamseldin screamed after Mr. Setzer, "come here, come here," "stop fucking running," "don't you move, don't you move, I swear to fucking God, don't you fucking move!"

53. Officers Steele and Shamseldin chased Mr. Setzer until they reached an abandoned parking lot on the corner of 1st Avenue SW, Hickory, and 10th Street SW, Hickory.

54. The abandoned parking lot was bordered by concrete retaining walls, leaving Mr. Setzer cornered with nowhere to go. At the same time, Officer Travis and his trainee, HPD Officer Faison, arrived in a patrol vehicle and took a right-hand turn onto 10th Street SW such that they were adjacent to the parking lot and driving parallel to Mr. Setzer and Officers Steele and Shamseldin.

55. Mr. Setzer was effectively contained with no immediately apparent avenues of escape.

56. At no point during the pursuit did Mr. Setzer stop running, turn toward the officers, brandish a weapon, or threaten harm to HPD officers or any others. Rather, he continuously fled with his back turned to the pursuing officers.

57. When Officers Steele and Shamseldin came within approximately 30 to 40 feet of Mr. Setzer, they opened fire, unleashing rapid succession shots into Mr. Setzer's body.

58. While still seated in the passenger seat, Officer Travis, in a display more suited for an action movie or first-person shooter video game, opened rapid succession fire at Mr. Setzer through the window of his patrol vehicle.

59. At the time Officer Travis opened fire on Mr. Setzer, he was approximately 50 to 60 feet away and his patrol vehicle was still moving.

60. In a scene disturbingly similar to an execution by firing squad, Defendant Officers continued to fire at Mr. Setzer even after he had been struck multiple times and collapsed

to the ground. The barrage of gunfire did not stop until Mr. Setzer lay completely motionless.

61. Notably, Defendant Officers' duty-issued Glock 17 handguns, which Defendant Officers used to shoot and kill Mr. Setzer, hold 18 bullets, with 17 bullets in the attached magazine and 1 bullet in the chamber. Both Officer Steele and Officer Shamseldin had to insert a fresh magazine and reload in the midst of the shooting.

62. Defendant Officers never issued any commands instructing Mr. Setzer to drop a weapon, nor did they attempt to de-escalate the situation or employ any less-lethal means to apprehend Mr. Setzer.

63. At no point did Defendant Officers provide any warning that deadly force would be used.

64. At the moment Defendant Officers used deadly force, several other HPD officers had arrived on scene. As such, Mr. Setzer was effectively surrounded by at least 7 HPD Officers, including Officer Steele, Officer Travis, Officer Shameseldin, Trainee Officer Faison, Sergeant Totillo, Officer Cassidy, and Officer Berry.

65. During the encounter with Mr. Setzer, no officer was injured.

66. After the shooting, Mr. Setzer was clearly fatally injured, lying motionless with blood pouring from his body and head.

67. As a result of Defendant Officers' conduct, Mr. Setzer died at the scene.

**_Post-Incident Investigations by Hickory Police Department and North Carolina State Bureau of Investigation_**

68. In the hours following the shooting, the involved officers completed written reports purporting to describe the events leading to Mr. Setzer's death.

69. In addition, the North Carolina State Bureau of Investigation ("SBI") conducted an investigation into the shooting incident.

12

70. From the outset, Defendant Officers provided conflicting, implausible, and otherwise problematic accounts of the shooting. In particular, statements made by Defendant Officers during their SBI interviews: (1) conflicted with initial police reports and the testimony of other officers; (2) were implausible in light of the known circumstances; (3) suggested that Mr. Setzer did not pose a threat to the officers at the time of the shooting; and/or (4) indicated an intent to continue firing in rapid succession until Mr. Setzer was deceased.

71. In their initial reports, Defendant Officers claimed they had received information that a white male wearing a dark jacket was seen waving a firearm aimlessly on 2nd Avenue SW in Hickory. However, audio from body-worn camera footage reveals that the actual report described a white male in a jacket walking the wrong way and yelling on 2nd Avenue SW. There was no mention of the suspect aimlessly waving a firearm.

72. In his initial report, Officer Shamseldin claimed that, as Mr. Setzer ran toward the retaining wall prior to the shooting, Mr. Setzer pulled a firearm out of his waistband.

73. During his SBI Interview, Officer Shamseldin provided a more detailed account, alleging that as Mr. Setzer ran toward the retaining wall in the abandoned parking lot, he stopped, crouched and/or "tripped" into a "tactical shooting position," "sucked in his stomach," pulled a "black object" from his waistband, and turned toward Officers Steele and Shamseldin as if to shoot.

74. During his SBI Interview, Officer Shamseldin further admitted that,

> After [Officer Shamseldin] fired [his] initial shot, [he] felt like the guy [they] were shooting at was still kind of moving. [Officer Shamseldin] never seen [sic] [Mr. Setzer] drop anything, [Officer Shamseldin] never seen [sic] [Mr. Setzer] stop the motion he was making, so [Defendant Officers] - [Officer Shamseldin didn't] know how many shots [he] fired, but [Defendant Officers] shot until [Mr. Setzer] stopped moving."

13

75. Body-worn camera footage makes clear that any and all movements Mr. Setzer made after Defendant Officers opened fire, while he was already lying on the ground, were not voluntary and deliberate movements intended to threaten officers. Rather, they were the involuntary spasms of a body being struck by a barrage of bullets from three officers at once.

76. During Officer Steele's SBI interview, Officer Steele claimed that he "clearly saw" Mr. Setzer draw a small, black handgun from his waistband while running toward the retaining wall.

77. Officer Steele stated, "[a]fter [Mr. Setzer] fell to the ground, we didn't know where the gun was, and [Mr. Setzer] continued to not show his hands. I discharged my weapon a few more times while [Mr. Setzer] was laying on the ground."

78. When an SBI investigator asked Officer Steele if Mr. Setzer had used any force prior to the shooting, Officer Steele claimed that Mr. Setzer had been shooting into homes. Notably, Defendant Officers never witnessed Mr. Setzer with a gun, let alone shooting into homes, and, at that time, HPD had not made a positive identification on the alleged shooter. Moreover, Officer Steele (1) admitted that Mr. Setzer never used force against police officers and (2) confirmed that Mr. Setzer initially put his hands up in response to Office Steele's commands and was fleeing from officers when the shooting occurred.

79. In his initial report and SBI interview, Officer Travis claimed that he and Officer Faison were nearly parallel with Mr. Setzer when they drove into the abandoned parking lot in the patrol vehicle. Officer Travis further asserted that Mr. Setzer then ran to the northeast corner of the lot, stopped, and reached into his waistband as if pulling out a firearm. At that point, Mr. Setzer turned to his right and extended his arms as if to shoot a firearm.

14

80. However, in his SBI interview, Officer Travis admitted that he never actually saw Mr. Setzer with a weapon and that, as Mr. Setzer was running, his back remained toward Officers Steele and Shamseldin.

81. Moreover, despite claiming that he fired at Mr. Setzer because Mr. Setzer allegedly spun around as if to fire upon Officers Steele and Shamseldin, Officer Travis admitted in his SBI interview that he did not begin shooting out of the passenger window of his patrol vehicle until after Officers Steele and Shamseldin had already opened fire. This sequence of events reflects less of a measured response to an actual threat, and more of an impulsive decision to join in the gunfire simply because other officers were shooting.

82. Timestamps from Officer Travis' body camera footage confirm that Officer Travis' response was not threat-based, but rather, a reaction to the ongoing gunfire from his fellow officers. The timestamps are as follows:

   a. 6 minutes and 28 seconds – Officers Travis and Faison pull up to the scene in the patrol car. At this time in the video, Officer Travis' patrol car is on 1st Avenue SW, Hickory with the abandoned parking lot to his right. Footage shows that as Officers Travis and Faison are approaching, Officers Shamseldin and Steele are running across 1st Avenue SW and towards the abandoned parking lot after Mr. Setzer.

   b. 6 minutes and 31 seconds – Officer Travis' patrol vehicle begins to make a right-hand turn on 10th Street SW, which also runs adjacent to the abandoned parking lot.

   c. 6 minutes and 33 seconds – Officer Travis' patrol vehicle is completing the right-hand turn onto 10th Street SW. As it does so, the patrol vehicle begins to run parallel with Mr. Setzer and Officers Steele and Shamseldin.

15

d.  6 minutes and 33 seconds – As Officer Travis' patrol vehicle is completing the right-hand turn, audio from Officer Travis' body camera footage indicates that Officers Steele and Shamseldin begin firing shots at Mr. Setzer.

e.  6 minutes and 34 seconds – Officer Travis leans back in his passenger seat, appearing to draw his Glock 17 from his duty belt. Officers Steele and Shamseldin continue to fire shots at Mr. Setzer.

f.  6 minutes and 36 seconds – Officer Travis has his gun in hand and leans out the passenger window.

g.  Between 6 minutes and 36 seconds to 6 minutes and 37 seconds – Audio from Officer Travis' body camera footage indicates that Officer Travis begins firing his weapon at Mr. Setzer. Audio further indicates that by the time Officer Travis began shooting, Officers Steele and Shamseldin had already fired approximately 10 to 15 shots. Officer Travis began shooting before his patrol car came to a complete stop.

83.  The SBI also interviewed Officer Faison, who was in the driver's seat of the patrol car with Officer Travis. During his interview, he stated that while Mr. Setzer was running toward the retainer wall of the abandoned parking lot, his back remained toward Officer Faison and Officer Travis. Officer Faison further stated that because Mr. Setzer's back remained turned toward Officer Faison and Officer Travis, everything was happening so fast, and he was so far away from Mr. Setzer, Officer Faison could not observe Mr. Setzer's hand movements or determine what Mr. Setzer was doing with his hands.

84.  Defendant Officers' accounts of Mr. Setzer's alleged conduct, particularly their claims that Mr. Setzer drew a firearm as if to shoot at officers, are demonstrably false. In fact, body-

16

worn camera footage shows that Mr. Setzer never stopped running, never turned toward the officers, and never aimed any object in their direction.

85. Further, physical evidence contradicts Defendant Officers' statements as no firearm was found at or near Mr. Setzer's body, and the autopsy confirmed that Defendant Officers shot multiple bullets into Mr. Setzer's posterior.

86. Moreover, Defendant Officers were 30 or more feet away from Mr. Setzer, and the shooting occurred in a dark, abandoned lot, illuminated only by officers' weapon lights and the headlights of a patrol vehicle.

87. After the gunfire ceased, Officer Cassidy approached Mr. Setzer's motionless body, placed him in handcuffs, and searched his person. Officer Cassidy did not find a firearm on Mr. Setzer's person.

88. No first aid was rendered as Mr. Setzer was unresponsive and his wounds were obviously fatal.

89. Body-worn camera footage shows that HPD Officers searched the surrounding area and were unable to locate a firearm belonging to Mr. Setzer. Moreover, audio on body-worn camera footage indicates that Officer Shamseldin, who originally reported observing Mr. Setzer with a firearm explicitly asked if anyone had found a gun on Mr. Setzer.

90. Officer Cassidy also interviewed a witness at the witness's residence and conducted a thorough search for the missing firearm along the route from the residence to the scene of the shooting. Despite these efforts, Officer Cassidy could not locate the firearm allegedly belonging to Mr. Setzer.

91. HPD Officer Berry deployed HPD K-9 Rocco to conduct an article search for evidence and weapons. K-9 Rocco scanned the vacant lot where the shooting occurred and several areas

17

and residences where witnesses observed the suspect, alleged to be Mr. Setzer, walking. Despite these efforts, Officer Berry and K-9 Rocco could not locate a firearm belonging to Mr. Setzer.

92. Nearly 9 hours after the shooting, at approximately 8:45 A.M., SBI Special Agent R. T. Powers located a firearm near an outbuilding in the wooded area surrounding the abandoned parking lot. The firearm was located only after use of a Trimble X7 scanner.

93. The location of the firearm was not clearly visible from the area where the shooting occurred and was a substantial distance from the retaining wall where Mr. Setzer was killed.

94. Upon information and belief, no physical evidence links the located firearm to Mr. Setzer.

95. SBI investigators recovered 28 spent shell casings belonging to Defendant Officers' duty-issued Glock 17s at the scene. SBI investigators also recovered an empty Sig Pro 9mm magazine allegedly belonging to Mr. Setzer; however, upon information and belief, there is no physical evidence linking the empty magazine to Mr. Setzer.

### *Violations of HPD Policies*

96. Upon information and belief, at all times relevant hereto, the Hickory Police Department maintained and enforced multiple policies governing the use of force by its officers, including:

   a. **Policy 300.2.1 – Duty to Intercede and Report;**

   b. **Policy 300.4.2 – Factors Used to Determine the Reasonableness of Force;**

   c. **Policy 300.4.6 – Alternative Tactics – De-Escalation;** and

   d. **Policy 300.5 – Deadly Force Applications.**

97. **Policy 300.2.1 – Duty to Intercede and Report** provides that:

18

Any officer present and observing another law enforcement officer or a member using force that is beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. Any officer who observes another law enforcement officer or a member use force that is potentially beyond that which is objectively reasonable under the circumstances should report these observations to a supervisor as soon as feasible.

98. Despite this policy, Officer Travis admitted that he never saw Mr. Setzer with a weapon, yet he fired his weapon along with the other officers and failed to take any steps to stop or intercede in the use of deadly force by Officers Steele and Shamseldin.

99. Officers Steele and Shameldin admitted that Mr. Setzer was not moving and that they intentionally continued shooting until he stopped moving.

100. These circumstances made it objectively clear that the continued use of deadly force was no longer justified. At the time of the shooting, no fewer than seven HPD officers, including the Defendant Officers, were present at the scene. Yet, not a single officer took steps to intervene or prevent the excessive use of force, nor did any officer promptly report the unlawful conduct to a supervisor as required by department policy.

101. **Policy 300.4.2 – Factors to Determine Reasonableness of Force** requires officers to consider a variety of factors in deciding whether force is reasonable, including but not limited to:

   a. The immediacy and severity of the threat;

   b. The conduct of the individual;

   c. Officer/subject factors (e.g., the number of officers available vs. subjects);

   d. Whether the individual has been effectively restrained and his/her ability to resist;

   e. Proximity of weapons or dangerous improvised devices;

   f. The availability of other reasonable and feasible options; and

19

g. Whether the conduct of the individual no longer reasonably appears to pose an imminent threat.

102. Defendant Officers failed to appropriately weigh department-required factors when determining whether the use of deadly force was reasonable. Defendant Officers effectively ignored mandatory considerations in Policy 300.4.2 and instead used objectively unreasonable, deadly force. Particularly:

a. At the time the fatal shots were fired, was unarmed and fleeing with his back turned. As such, Mr. Setzer posed no immediate threat to officers or others.

b. At the time of the shooting, there was an overwhelming officer presence in that at least 7 HPD officers were present, efficiently surrounding Mr. Setzer in a confined, abandoned parking lot. Moreover, Defendant Officers actions as described more particularly hereinabove reflect an absolute failure to even consider feasible, less-lethal alternatives to deadly force.

c. Defendant Officers completely disregarded the cessation of any perceivable threat. Specifically, Defendant Officers continued to fire on Mr. Setzer even after he had been struck multiple times and collapsed to the ground.

103. **Policy 300.4.6 – Alternative Tactics – De-Escalation** directs that, when circumstances reasonably permit, officers should use non-violent strategies and techniques to decrease the intensity of a situation, improve communication, reduce the need for force, and increase voluntary compliance, such as summoning additional resources, formulating a plan, or attempting verbal persuasion.

104. At no point did Defendant Officers make any effort to de-escalate the situation. Instead, they escalated it immediately upon arrival by drawing their firearms before even exiting

20

their patrol vehicles and initiating a foot pursuit of Mr. Setzer. As they chased him toward the abandoned parking lot, the officers shouted profanities and aggressive commands, further heightening the intensity of the encounter rather than attempting to calm or contain it.

105. Even after cornering Mr. Setzer in a contained and abandoned parking lot, Defendant Officers made no attempt to de-escalate the situation. Despite having numerical superiority, superior firepower, and clear containment of the suspect, the officers failed to employ any tactical pause, communication strategy, or less-lethal intervention. Instead, they immediately resorted to what can only be described as firing-squad-like behavior, discharging their weapons in rapid succession at Mr. Setzer without warning, without assessing whether he posed an imminent threat, and without making any further effort to resolve the situation peacefully.

106. **Policy 300.5 – Deadly Force Applications** states that deadly force is justified only when it is or appears reasonably necessary to protect against an imminent threat of death or serious bodily injury, or to stop a fleeing subject who poses such a threat, and that, where feasible, officers should provide a verbal warning.

107. At the time of the shooting, Mr. Setzer was running away from officers with his back turned, unarmed, and not posing an immediate threat to anyone. Officers opened fire, striking Mr. Setzer as he fled. After being hit, Mr. Setzer fell to the ground and lay motionless, clearly no longer a threat.

108. Despite his incapacitation, Officers Travis, Steele, and Shameldin continued to fire multiple rounds into Mr. Setzer while he was on the ground. Officer Travis admitted he never saw a weapon on Mr. Setzer. Officers Steele and Shameldin admitted that Mr. Setzer

21

was not moving and that they intentionally continued shooting until he stopped moving entirely.

109. Moreover, no verbal warning was issued before the fatal shots, in direct violation of Policy 300.5.

110. The facts of this case demonstrate that multiple Hickory Police Department policies purportedly designed to safeguard human life and ensure the reasonable application of force were plainly violated.

### *Autopsy*

111. The Catawba County Medical Examiner and the North Carolina Office of the Chief Medical Examiner determined that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

112. On or about August 16, 2023, Dr. Tiffany O'Neill, DO and Edward Spencer, Jr., conducted Mr. Setzer's Autopsy. *See* **Exhibit B, Autopsy.**

113. Dr. O'Neill listed Mr. Setzer's cause of death as homicide.

114. According to Dr. O'Neill, there were 15 separate gunshot pathways in Mr. Setzer's body, as well as multiple wounds from bullet grazes and 8 projectiles recovered from Mr. Setzer's body and clothes.

115. The gunshot pathways included shots to Mr. Setzer's head, torso, abdomen, right shoulder, right forearm, left shoulder, right buttock, right thigh, right foot, right leg, left thigh, and pelvis.

116. Dr. O'Niell recovered the following 4 projectiles from Mr. Setzer's body: one that entered from Mr. Setzer's left leg and went into his pelvis, one that entered from the top of his head

22

and was found in his brain, one in the chest that struck his liver and went to his stomach, and one that entered from his upper back and hit his lung; diaphragm; and spleen.

117. Among the most significant and fatal injuries documented at autopsy were:

   a. **A gunshot wound to the top of the head** with a **downward trajectory**, which perforated the left frontal lobe of Mr. Setzer's brain and caused catastrophic brain injury. This wound's downward path is inconsistent with any claim that Mr. Setzer was upright, facing, or charging the officers at the time he was shot.

   b. **A gunshot wound to the left upper back** with a **downward trajectory**, which perforated the left lung and spleen. The location and trajectory of this wound are consistent with Mr. Setzer being shot from behind while leaning forward, running, or falling, and are inconsistent with an immediate threat to any officer.

   c. **Two gunshot wounds to the right buttocks**, which **entered from the posterior right thigh** and had **upward trajectory**. The location and trajectory of these wounds are consistent with Mr. Setzer being shot from behind while leaning forward, running or falling, and are inconsistent with an immediate threat to any officer.

   d. **A gunshot wound to the inferior right chest** with a **front-to-back, right-to-left, downward trajectory**, which perforated the right lobe of the liver and the stomach. This injury further corroborates that Mr. Setzer's body position at the time of impact was not consistent with an aggressive, armed posture toward the officers.

118. The forensic evidence from these fatal injuries, combined with (1) Officer Travis' sworn statement that he never saw a gun, (2) Defendant Officers' inconsistent and implausible accounts of the shooting, and (3) clear evidence that Mr. Setzer did not have a gun on him

23

at the time Defendant Officers' opened fire, demonstrate that there was no objectively reasonable basis to perceive an immediate threat of death or serious bodily harm at the time deadly force was used. *See* **Exhibit B, Autopsy;** *see also* **Exhibit C, X-ray Scans.**

<u>**FIRST CAUSE OF ACTION**</u>
**Violations of 42 U.S.C. § 1983 – Excessive Force**
(*As Against Officer Austin Steele in his Individual Capacity*)

119. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

120. This cause of action is brought against Officer Steele in his individual capacity.

121. By the actions and omissions described above, done under the color of state law, Defendant Steele violated 42 U.S.C. § 1983 by depriving Plaintiff of the following clearly-established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

   a. The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

   b. The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

   c. The right to be free from the use of unlawful deadly force as secured by the Fourth and Fourteenth Amendments;

   d. The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;

   e. The right to be free from deprivation of liberty and injury without substantive due process and free from state created danger as secured by the Fourteenth Amendment; and

   f. In such other particulars as may be learned through discovery.

24

122. At all relevant times, Defendant Officer Steele was acting under color of state law in his capacity as a sworn law enforcement officer with the Hickory Police Department ("HPD").

123. On August 13, 2023, Officer Steele, acting in concert with Officers Shamseldin and Travis, unleashed multiple gunshots at Mr. Setzer as Mr. Setzer fled unarmed with his back to Defendant Officers, contributing to a relentless barrage of approximately thirty rounds fired at Mr. Setzer's person. As such, Officer Steele discharged his firearm at Mr. Setzer under circumstances in which Mr. Setzer posed no immediate threat to the safety of Defendant Officers or others.

124. Decades of clearly established law, including case law from the Supreme Court of the United States and the Fourth Circuit, make clear that law enforcement officers may not use deadly force against a fleeing suspect who does not pose an immediate threat to officers or others.

125. In addition, Officer Steele's conduct violated HPD policy as described more particularly hereinabove.

126. When Officer Steele first encountered Mr. Setzer, Defendant Officers had only vague reports of possible gunshots in the area and a generic description of a "white male in a jacket" walking and yelling on 2nd Avenue SW.

127. Officer Steele possessed no specific identifying information about the suspect, such as name, age, or distinguishing features, and had no confirmation that Mr. Setzer had fired a weapon or committed any violent crime.

128. Both Officers Steele and Shamseldin encountered Mr. Setzer on 2nd Avenue SW. Despite multiple reports and subsequent SBI interviews, neither officer reported seeing Mr. Setzer with a firearm at any point prior to the shooting.

25

129. Upon initial contact, Mr. Setzer complied with Officer Steele's verbal commands by raising his empty hands in the air, making it clear that he had no firearm in hand.

130. At no time did Mr. Setzer threaten Officer Steele or any other person.

131. Although Mr. Setzer fled on foot, body-worn camera footage confirms that his back remained turned to Defendant Officers, and he never (1) stopped running, (2) brandished a weapon, or (3) made threats.

132. The abandoned parking lot into which Officers Steele and Shamseldin pursued Mr. Setzer was bordered by concrete retaining walls, leaving him cornered with no means of escape. At that same time, additional HPD officers, including Defendant Officer Travis, Officer Faison, and others, were arriving from multiple directions, effectively surrounding Mr. Setzer.

133. At no point did Officer Steele issue any command instructing Mr. Setzer to drop a weapon, nor did he attempt to employ any less-lethal means to apprehend him.

134. Officer Steele made no attempt to de-escalate the situation before resorting to deadly force.

135. Instead, Officer Steele, acting in concert with Officers Shamseldin and Travis, opened fire and collectively discharged approximately thirty rounds at Mr. Setzer.

136. Officer Steele admitted that he continued to fire even after Mr. Setzer had collapsed to the ground, striking Mr. Setzer repeatedly until he lay motionless.

137. Defendant Officers' accounts of the shooting, including Officer Steele's allegations that he "clearly saw" Mr. Setzer stop and draw a small, black handgun while running toward the retaining wall, were inconsistent, implausible, and contradicted by statements from other HPD officers, physical evidence, body-worn camera footage, and scene conditions as follows:

26

a. The shooting occurred at night in an abandoned lot illuminated only by officers' weapon lights and the headlights of a single patrol vehicle, making it implausible for Officer Steele to "clearly" see a handgun in Mr. Setzer's hand from a distance of 30–40 feet while he was running away. Moreover, Officer Travis reported, and body-worn camera footage confirmed, that Mr. Setzer's back remained towards Officers Steele and Shamseldin while Mr. Setzer was running toward the retaining wall.

b. No other officer was able to confirm the presence of a firearm. Rather, Officer Shamseldin stated that he saw a "black object" and Officer Travis stated that he never saw a firearm.

c. No firearm was found on or immediately near Mr. Setzer's body, despite a thorough search by HPD officers and a trained police K-9 in the minutes following the shooting.

d. The only firearm recovered was found nearly nine hours later in a wooded area on the opposite side of the retaining wall, at a distance that would have required Mr. Setzer to throw it over the wall and far into the woods, an act not captured in any report, interview, or on any body-worn camera despite continuous recording.

e. Upon information and belief, there is no physical or forensic evidence linking that firearm to Mr. Setzer.

f. Autopsy results confirmed that Mr. Setzer sustained multiple gunshot wounds to his posterior, consistent with body-worn camera footage showing he never turned toward officers with a weapon.

27

138. Based on the totality of the circumstances, including but not limited to Mr. Setzer's lack of a weapon, the fact that Mr. Setzer was fleeing with his back turned to Defendant Officers, and the Defendant Officers' post-incident statements, Officer Steele's use of deadly force was objectively unreasonable, excessive, and violated Mr. Setzer's clearly established rights under the Fourth Amendment.

139. As a direct and proximate result of Officer Steele's conduct, Mr. Setzer suffered fatal injuries. Consequently, Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

140. The conduct of Defendant Steele in his individual capacity entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983.

141. Plaintiff is also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. §1988.

142. As a direct and proximate result of Defendant Steele's deprivation of the Mr. Setzer's rights secured by the Constitution and laws of the United States—including the right to be free from unreasonable seizures and excessive force—by shooting him multiple times while running away unarmed, Plaintiff has suffered injuries and damages. Plaintiff is entitled to recover all compensatory damages allowed by law, including damages for Mr. Setzer's physical injury, conscious pain and suffering, emotional distress, humiliation, and loss of enjoyment of life prior to death, as well as punitive damages against the individual Defendants pursuant to 42 U.S.C. §§ 1983 and 1988.

## SECOND CAUSE OF ACTION
### Violations of 42 U.S.C. § 1983 – Excessive Force
*(As Against Officer Isam Shamseldin in his Individual Capacity)*

143. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

144. This cause of action is brought against Officer Shamseldin in his individual capacity.

28

145. By the actions and omissions described above, done under the color of state law, Defendant Shamseldin violated 42 U.S.C. §1983 by depriving Plaintiff of the following clearly-established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

    a. The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

    b. The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

    c. The right to be free from the use of unlawful deadly force as secured by the Fourth and Fourteenth Amendments;

    d. The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;

    e. The right to be free from deprivation of liberty and injury without substantive due process and free from state created danger as secured by the Fourteenth Amendment; and In such other particulars as may be learned through discovery.

146. At all relevant times, Defendant Officer Shamseldin was acting under color of state law in his capacity as a sworn law enforcement officer with the Hickory Police Department ("HPD").

147. On August 13, 2023, Officer Shamseldin, acting in concert with Officers Steele and Travis, unleashed multiple gunshots at Mr. Setzer as Mr. Setzer fled unarmed with his back to Defendant Officers, contributing to a relentless barrage of approximately thirty rounds fired at Mr. Setzer's person. As such, Officer Shamseldin discharged his firearm at Mr.

29

Setzer under circumstances in which Mr. Setzer posed no immediate threat to the safety of Defendant Officers or others.

148. Decades of clearly established law, including case law from the Supreme Court of the United States and the Fourth Circuit, make clear that law enforcement officers may not use deadly force against a fleeing suspect who does not pose an immediate threat to officers or others.

149. In addition, Officer Shamseldin's conduct violated HPD policy as described more particularly hereinabove.

150. When Officer Shamseldin first encountered Mr. Setzer, Defendant Officers had only vague reports of possible gunshots in the area and a generic description of a "white male in a jacket" walking and yelling on 2nd Avenue SW.

151. Officer Shamseldin possessed no specific identifying information about the suspect, such as name, age, or distinguishing features, and had no confirmation that Mr. Setzer had fired a weapon or committed any violent crime.

152. Both Officers Steele and Shamseldin encountered Mr. Setzer on 2nd Avenue SW. Despite multiple reports and subsequent SBI interviews, neither officer reported seeing Mr. Setzer with a firearm at any point prior to the chase.

153. At no time prior to the chase did Mr. Setzer verbally threaten Officer Shamseldin or any other person, nor did he engage in any physical movement suggesting an imminent attack. Nevertheless, immediately upon arriving, Officer Shamseldin jumped from his patrol vehicle, drew his gun, and began chasing Mr. Setzer on foot while screaming threatening commands, such as "don't you move, don't you move, I swear to fucking God, don't you fucking move!"

154. Officer Shamseldin's aggressive approach unnecessarily escalated the encounter, heightened tensions, and set in motion the chain of events that culminated in Mr. Setzer's shooting and death.

155. Although Mr. Setzer fled on foot, body-worn camera footage confirms that his back remained turned to Defendant Officers, and he never (1) stopped running, (2) brandished a weapon, or (3) made threats.

156. The abandoned parking lot into which Officers Steele and Shamseldin pursued Mr. Setzer was bordered by concrete retaining walls, leaving him cornered with no means of escape. At that same time, additional HPD officers, including Defendant Officer Travis, Officer Faison, and others, were arriving from multiple directions, effectively surrounding Mr. Setzer.

157. At no point did Officer Shamseldin issue any command instructing Mr. Setzer to drop a weapon, nor did he attempt to employ any less-lethal means to apprehend Mr. Setzer.

158. Officer Shamseldin made no attempt to de-escalate the situation before resorting to deadly force.

159. Instead, Officer Shamseldin, acting in concert with Officers Steele and Travis, opened fire and collectively discharged approximately thirty rounds at Mr. Setzer.

160. Officer Shamseldin admitted that he continued to fire even after Mr. Setzer had collapsed to the ground, striking Mr. Setzer repeatedly until he lay motionless.

161. Officer Shamseldin's account of the shooting was inconsistent, implausible, and contradicted by statements from other HPD officers, physical evidence, body-worn camera footage, and scene conditions as follows:

31

a. Officer Shamseldin claimed to have observed a "black object" in Mr. Setzer's hand as Mr. Setzer ran away; however, body-worn camera footage from his own perspective shows no such object visible, and the lighting in the area, limited to weapon-mounted lights and a single patrol car's headlights, would have made such an observation improbable from his reported distance of approximately 30 to 40 feet.

b. Officer Shamseldin asserted that he feared Mr. Setzer was about to shoot at officers; yet, at the time of the shooting, Mr. Setzer was running directly away from him, with no indication of turning or aiming a weapon.

c. Officer Shamseldin gave a slowed-down, cinematic description of Mr. Setzer "suck[ing] in his stomach," pulling a "black object" from his waistband, tripping and/or crouching into a "tactical shooting position," and turning towards Officers Steele and Shamseldin as if to shoot. However, both Officer Travis and Officer Faison stated, and body-worn camera footage confirmed, that Mr. Setzer's back was to Officers Shamseldin and Steele as he fled toward the retaining wall. Given Mr. Setzer's positioning, the poor lighting, rapid pace of events, and Officer Shamseldin's distance from Mr. Setzer, such a detailed observation was highly unlikely if not impossible.

d. No firearm was found on or near Mr. Setzer's body immediately after the shooting, despite a thorough on-scene search by HPD officers and a trained police K-9.

e. The only firearm recovered was found nearly nine hours later in a wooded area on the opposite side of the retaining wall, at a distance that would have required Mr.

Setzer to throw it over the wall and far into the woods, an act not captured in any report, interview, or on any body-worn camera despite continuous recording.

    f. Upon information and belief, there is no physical or forensic evidence linking that firearm to Mr. Setzer.

    g. Autopsy results confirmed that Mr. Setzer sustained multiple gunshot wounds to his posterior, consistent with body-worn camera footage showing he never turned toward officers with a weapon.

162. Based on the totality of the circumstances, including but not limited to Mr. Setzer's lack of a weapon, the fact that Mr. Setzer was fleeing with his back turned, and the Defendant Officers' post-incident statements, Officer Shamseldin's use of deadly force was objectively unreasonable, excessive, and violated Mr. Setzer's clearly established rights under the Fourth Amendment.

163. As a direct and proximate result of Officer Shamseldin's conduct, Mr. Setzer suffered fatal injuries. Consequently, Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

164. The conduct of Defendant Shamseldin in his individual capacity entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983.

165. Plaintiff is also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. §1988.

166. As a direct and proximate result of Defendants Shamseldin's deprivation of Mr. Setzer's rights secured by the Constitution and laws of the United States—including the right to be free from unreasonable seizures and excessive force—by shooting him multiple times while running away unarmed, Plaintiff has suffered injuries and damages. Plaintiff is entitled to recover all compensatory damages allowed by law, including damages for Mr.

Setzer's physical injury, conscious pain and suffering, emotional distress, humiliation, and loss of enjoyment of life prior to death, as well as punitive damages against the individual Defendants pursuant to 42 U.S.C. §§ 1983 and 1988.

### THIRD CAUSE OF ACTION
**Violations of 42 U.S.C. § 1983 – Excessive Force**
*(As Against Officers Aaron Travis in his Individual Capacity)*

167. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

168. This cause of action is brought against Officer Travis in his individual capacity.

169. By the actions and omissions described above, done under the color of state law, Defendant Travis violated 42 U.S.C. §1983 by depriving Plaintiff of the following clearly-established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

    a. The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

    b. The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

    c. The right to be free from the use of unlawful deadly force as secured by the Fourth and Fourteenth Amendments;

    d. The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;

    e. The right to be free from deprivation of liberty and injury without substantive due process and free from state created danger as secured by the Fourteenth Amendment; and

    f. In such other particulars as may be learned through discovery.

34

170. At all relevant times, Defendant Officer Travis was acting under color of state law in his capacity as a sworn law enforcement officer with the Hickory Police Department ("HPD").

171. On August 13, 2023, Officer Travis, acting in concert with Officers Shamseldin and Steele, unleashed multiple gunshots at Mr. Setzer as Mr. Setzer fled unarmed with his back to Defendant Officers, contributing to a relentless barrage of approximately thirty rounds fired at Mr. Setzer's person. As such, Officer Travis discharged his firearm at Mr. Setzer under circumstances in which Mr. Setzer posed no immediate threat to the safety of Defendant Officers or others.

172. Decades of clearly established law, including case law from the Supreme Court of the United States and the Fourth Circuit, make clear that law enforcement officers may not use deadly force against a fleeing suspect who does not pose an immediate threat to officers or others.

173. In addition, Officer Travis' conduct violated HPD policy as described more particularly hereinabove.

174. When Officer Travis arrived on scene, Defendant Officers had only vague reports of possible gunshots in the area and a generic description of a "white male in a jacket" walking and yelling on 2nd Avenue SW.

175. Officer Travis possessed no specific identifying information about the suspect, such as name, age, or distinguishing features, and had no confirmation that Mr. Setzer had fired a weapon or committed any violent crime.

176. By the time Officer Travis made visual contact with Mr. Setzer, Defendant Officers Steele and Shamseldin were already pursuing him on foot toward the concrete retaining walls of the abandoned parking lot. At the same time, additional HPD officers were arriving from

35

multiple directions, effectively surrounding Mr. Setzer and leaving him with no viable means of escape.

177. Officer Travis' own SBI interview confirmed that he never actually saw Mr. Setzer with a firearm at any time. He acknowledged that, during the pursuit, Mr. Setzer's back remained toward Officers Shamseldin and Steele as Mr. Setzer fled.

178. Body-worn camera footage and timestamps show that Officer Faison, who was driving a patrol vehicle with Officer Travis in the passenger seat, was still turning the patrol vehicle onto 10th Street SW, the street adjacent to the abandoned parking lot, when Officers Shamseldin and Steele began firing at Mr. Setzer. Specifically:

   a. At approximately 6 minutes and 33 seconds, as Officer Travis' patrol vehicle was completing its right-hand turn onto 10th Street SW, audio captures Officers Shamseldin and Steele firing the first shots.

   b. At approximately 6 minutes and 34 seconds, Officer Travis leaned back in his seat to retrieve his duty-issued Glock 17 from his duty belt.

   c. Between 6 minutes and 36 seconds and 6 minutes and 37 seconds, he leaned out of the passenger window and began firing multiple rounds, despite having just arrived, not seeing a weapon, and before his vehicle had come to a complete stop.

179. By the time Officer Travis began shooting at Mr. Setzer, Officers Steele and Shamseldin had already fired approximately 10–15 rounds. As such, Officer Travis' decision to shoot was not threat-based, but rather, a reaction to the ongoing gunfire from his fellow officers.

180. Further, firing out of a moving patrol car's passenger window is the stuff of action movies and video games, not sound police tactics in a real-world use-of-force encounter. Such

36

conduct was dangerous, reckless, and, upon information and belief, inconsistent with accepted HPD law enforcement training and standards.

181. Officer Travis' account of the shooting was inconsistent, implausible, and contradicted by statements from other HPD officers, physical evidence, body-worn camera footage, and scene conditions as follows:

   a. Officer Travis initially claimed that he and Officer Faison were nearly parallel to Mr. Setzer when Mr. Setzer stopped, reached into his waistband, and turned as if to fire. However, Officer Travis admitted, and his own body-worn camera footage confirms, that he began shooting only after Officers Shamseldin and Steele were already firing.

   b. Officer Faison, who was in the driver's seat of the patrol vehicle with Officer Travis, he stated that while Mr. Setzer was running toward the retaining wall of the abandoned parking lot, his back remained toward Officer Faison and Officer Travis.

   c. Officer Faison further stated that because Mr. Setzer's back remained turned toward Officer Faison and Officer Travis, everything was happening so fast, and the patrol vehicle was so far away from Mr. Setzer, approximately 50-60 feet, Officer Faison could not observe Mr. Setzer's hand movements or determine what Mr. Setzer was doing with his hands.

   d. No firearm was found on or immediately near Mr. Setzer's body, despite a thorough search by HPD officers and a trained police K-9 in the minutes following the shooting.

   e. The only firearm recovered was found nearly nine hours later in a wooded area on the opposite side of the retaining wall, at a distance that would have required Mr.

37

Setzer to throw it over the wall and far into the woods, an act not captured in any report, interview, or on any body-worn camera despite continuous recording.

f. Upon information and belief, there is no physical or forensic evidence linking that firearm to Mr. Setzer.

g. Autopsy results confirmed that Mr. Setzer sustained multiple gunshot wounds to his posterior, consistent with body-worn camera footage showing he never turned toward officers with a weapon.

182. Based on the totality of the circumstances, including but not limited to Mr. Setzer's lack of a weapon, the fact that Mr. Setzer was fleeing with his back turned, and the Defendant Officers' post-incident statements, Officer Travis' use of deadly force was objectively unreasonable, excessive, and violated Mr. Setzer's clearly established rights under the Fourth Amendment.

183. As a direct and proximate result of Officer Travis' conduct, Mr. Setzer suffered fatal injuries. Consequently, Plaintiff seeks compensatory and punitive damages, attorneys' fees under 42 U.S.C. § 1988, and any other relief this Court deems just.

184. The conduct of Defendant Travis in his individual capacity entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. §1983.

185. Plaintiff is also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. §1988.

186. As a direct and proximate result of Defendants Travis's deprivation of Mr. Setzer's rights secured by the Constitution and laws of the United States—including the right to be free from unreasonable seizures and excessive force—by shooting him multiple times while running away unarmed, Plaintiff has suffered injuries and damages. Plaintiff is entitled to recover all compensatory damages allowed by law, including damages for Mr. Setzer's

physical injury, conscious pain and suffering, emotional distress, humiliation, and loss of enjoyment of life prior to death, as well as punitive damages against the individual Defendants pursuant to 42 U.S.C. §§ 1983 and 1988.

## FOURTH CAUSE OF ACTION
### Assault & Battery
*(As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory)*

187. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

188. At all relevant times, Defendant Officers were acting under color of state law in their capacities as sworn law enforcement officers with HPD.

189. On August 13, 2023, Defendant Officers intentionally unleashed a relentless barrage of approximately 30 gunshots at Mr. Setzer as Mr. Setzer fled unarmed with his back to Defendant Officers.

190. Defendant Officers' use of deadly force was unjustifiable, excessive, and unreasonable under the circumstances, as described more particularly hereinabove.

191. Defendant Officers' intentional acts as described more fully hereinabove put Mr. Setzer in actual, subjective apprehension of immediate harmful and offensive bodily contact.

192. Mr. Setzer's apprehension was objectively reasonable under the circumstances, in that a person of ordinary care and prudence under the same or similar circumstances would have believed that harmful, or offensive contact was about to occur.

193. As evidenced by body-worn camera footage, officers' statements, and Mr. Setzer's autopsy, Defendant Officers made actual, harmful, and offensive contact with Mr. Setzer's person as described more particularly hereinabove.

194. Defendant Officers' intentional acts directly and proximately caused the harmful and offensive contact with Mr. Setzer's person, ultimately leading to Mr. Setzer's death.

39

195. As described more particularly herein, Defendant Officers' conduct was unreasonable and unlawful, in violation of Mr. Setzer's constitutionally protected rights. As such, Defendant Officers' contact with Mr. Setzer's person occurred without legal justification or privilege.

196. Defendant Officers' conduct as described more particularly hereinabove constitutes assault and battery under North Carolina law.

197. Moreover, at all times relevant to this action, the Defendant Officers were acting within the course and scope of their employment with the Hickory Police Department and the City of Hickory. Accordingly, their conduct is attributable to the City of Hickory, which bears liability under the doctrine of *respondeat superior.*

198. As a direct and proximate result of Defendants' unlawful and offensive physical contact—specifically, the repeated discharge of firearms into the unarmed Mr. Setzer—Plaintiff has suffered injuries and damages and is entitled to recover all compensatory damages allowed by law, including damages for Mr. Setzer's physical pain and suffering, emotional distress, mental anguish, and loss of enjoyment of life prior to death, as well as punitive damages to punish and deter such egregious and wanton misconduct.

## FIFTH CAUSE OF ACTION
### Wrongful Death (Intentional)
*(As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory)*

199. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

200. Christina Tolley is the Personal Representative of the Estate of Timothy Craig Setzer, and thus is the properly named party in this lawsuit.

201. The acts and omissions of Defendants, particularly Defendant Officers' assault and battery upon Mr. Setzer's person and Defendant City of Hickory's negligent training and/or supervision, directly and proximately caused Mr. Setzer's wrongful death.

40

202. As Mr. Setzer was shot by a barrage of approximately 30 bullets, Mr. Setzer experienced severe pain and suffering prior to his death.

203. Mr. Setzer's Estate has incurred funeral and other expenses as a result of Defendants' acts and/or omissions as more particularly described hereinabove.

204. Moreover, at all times relevant to this action, the Defendant Officers were acting within the course and scope of their employment with the Hickory Police Department and the City of Hickory. Accordingly, their conduct is attributable to the City of Hickory, which bears liability under the doctrine of *respondeat superior.*

205. As a direct and proximate result of Defendants' wrongful acts constituting assault and battery—specifically, the repeated shooting of the unarmed Mr. Setzer as described herein—Plaintiff is entitled to recover from Defendants all damages allowed by N.C. Gen. Stat. § 28A-18-2(b). These damages include, but are not limited to, the value of Mr. Setzer's services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice; compensation for Mr. Setzer's conscious pain, suffering, terror, and emotional distress prior to death; reasonable funeral expenses; and the present monetary value of Mr. Setzer's expected net income.

### SIXTH CAUSE OF ACTION
**Survival Action - Pleaded in the Alternative Pursuant to North Carolina Rule of Civil Procedure 8(d)(2)**
*(As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory)*

206. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

207. Pleading in the alternative, and in the event that it is determined that Mr. Setzer's death was not caused by all the Defendants aforementioned negligence, conduct, and breach of duties, Plaintiff asserts a survival claim against the Defendants, jointly and severally, and

41

she is entitled to recover all damages that Mr. Setzer could have recovered against the Defendants had he lived.

208. The Defendants' joint and several negligence, intentional conduct, and breach of duties, as described in the foregoing paragraphs, directly and proximately caused Mr. Setzer to suffer personal injuries, including but not limited to, multiple gunshot wounds; and, as a result, during the last moments of his life, Mr. Setzer experienced extreme and severe physical pain and emotional and mental anguish and suffering, loss of dignity, loss of capacity to enjoy life, a reduced life expectancy; and other bodily, mental, and emotional injuries.

209. Moreover, at all times relevant to this action, the Defendant Officers were acting within the course and scope of their employment with the Hickory Police Department and the City of Hickory. Accordingly, their conduct is attributable to the City of Hickory, which bears liability under the doctrine of *respondeat superior.*

210. As a direct and proximate result of Defendants' wrongful acts and omissions, including the repeated shooting of the unarmed Mr. Setzer, the Estate of Timothy Craig Setzer, Jr. is entitled to recover all damages allowed by N.C. Gen. Stat. § 28A-18-1. These damages include Mr. Setzer's conscious pain and suffering, terror, and emotional distress experienced while being shot, medical expenses, lost earnings prior to death, and any other damages Mr. Setzer could have recovered had he lived.

**SEVENTH CAUSE OF ACTION**
**Wrongful Death Negligence/ Gross Negligence - Pleaded in the Alternative Pursuant to North Carolina Rule of Civil Procedure 8(d)(2)**
(*As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory*)

211. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

42

212. All Individual Defendants owed a duty to Mr. Setzer and to the general public, to perform their duties in such a way as to avoid placing Mr. Setzer and other members of the public in unreasonable danger of serious injury or death. Furthermore, all Defendants owed a duty to ensure that Mr. Setzer and other members of the public would be free from unreasonable searches and seizures and excessive force.

213. Defendant City of Hickory owed a duty to Plaintiff and the general public, to ensure that the Hickory Police Department and its agents and employees performed their duties, in such a way as to avoid placing Plaintiff and other members of the law abiding public, in danger of serious injury or death.

214. Defendant City breached these duties with regard to Plaintiff in various ways, including, but not limited to, the following:

    a. Failing to establish reasonable policies or to take reasonable precautions in the hiring, promotion and retention of Hickory Police Department personnel;

    b. Negligently hiring Defendants Steele, Travis, and Shamseldin;

    c. Negligently failing to fire or suspend Defendants Steele, Travis, and Shamseldin;

    d. Failing to properly train Defendants Steele, Travis, and Shamseldin;

    e. Failing to properly supervise the activities of Defendants Steele, Travis, and Shamseldin;

    f. Failing to train, supervise, instruct, and/or monitor employees of the Hickory Police Department, including Defendants Steele, Travis, and Shamseldin, in the use of force against suspects, suspicious persons, and members of the law abiding public;

    g. Failing to establish reasonable procedures to train officers to properly respond to reports of suspicious activity;

43

h. Failing to establish reasonable and appropriate policies and procedures governing the situations under which and the manner in which Hickory Police Department personnel could use deadly force against suspicious persons and/or members of the public;

i. Failing to ensure that HPD personnel, including patrol officers, complied with existing policies and procedures regarding the use of deadly force against suspicious persons and/or members of the public;

j. Failing to take appropriate corrective action to prevent HPD personnel and others under his command from utilizing unreasonable and excessive force in response to other prior incidents involving the wrongful use of excessive or deadly force by HPD personnel;

215. All individual Defendants breached their duty by shooting at Mr. Setzer even though he posed no threat to law enforcement or others.

216. Specifically, members of the Hickory Police Department who fired their weapons at Mr. Setzer as he ran away from them, clearly violated the City of Hickory's Use of Force Policy.

217. Mr. Setzer was free of any negligence.

218. All individual Defendants' negligent acts and omissions constitute proximate causes of the incident which resulted in injuries to and the death of Mr. Setzer which Plaintiff on behalf of the Estate of Timothy Setzer is entitled to recover damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. §28A-18-2, as more particularly described herein.

219. At the time of the complained incident, all individual Defendants were acting within the scope of their employment with the City of Hickory. At the time all individual Defendants

44

committed the acts described herein, they were acting within the course and scope of their employment and/or agency with City of Hickory Police Department. As such, City of Hickory is liable for the intentional acts of all individual Defendants. Therefore, the negligent acts and omissions of all individual Defendants are imputed to the City through the doctrines of agency, vicarious liability and *respondeat superior*.

220. As a direct and proximate result of the negligent actions committed by all Defendants, including the unjustified shooting of the unarmed Mr. Setzer multiple times, Plaintiff is entitled to recover from Defendants all damages allowed by N.C. Gen. Stat. § 28A-18-2(b). These damages include, but are not limited to, the value of Mr. Setzer's services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice; compensation for Mr. Setzer's conscious pain and suffering prior to death; reasonable funeral expenses; and the present monetary value of Mr. Setzer's expected net income.

## EIGHTH CAUSE OF ACTION
### Negligence *Per Se*
*(As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory)*

221. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

222. North Carolina General Statute Section 15A-401(d)governs the use of force by law enforcement, and "in effect proscribes the use of the force by a law enforcement officer if the officer either knows that the arrest is unauthorized or does not have a reasonable belief that the suspect has committed a criminal offense."

223. An officer cannot shoot at a fleeing misdemeanant. Where a person charged with a misdemeanor is fleeing from arrest, and is out of the control of the officer, such officer is guilty of an assault if he shoots at said person. And indeed the use of a pistol in attempting

45

to arrest for a misdemeanor is excessive force. *Sossamon v. Cruse*, 133 N.C. 470, 45 S.E. 757 (1903).

224. These rules exist to safeguard life, prevent the infliction of unjustified physical injury, and ensure that deadly force is used only when strictly necessary. Mr. Setzer was a member of that protected class. The repeated shooting of an unarmed Mr. Setzer — first while he was running away with his back turned, and then while he was lying motionless on the ground — was the precise type of harm these policies were enacted to prevent.

225. Defendant Officers were not justified in using force against Mr. Setzer.

226. Mr. Setzer was free of any negligence.

227. At the time Defendant Officers fired their weapons at Mr. Setzer, Defendant Officers did not reasonably believe Mr. Setzer committed a criminal offense. N.C. Gen. Stat. § 15A-401(d)(1)(a).

228. At the time Defendant Officers fired their weapons at Mr. Setzer, Defendant Officers did not do so in defense of himself or third persons in violation of N.C. Gen. Stat. § 15A-401(d)(1)(b).

229. At the time Defendant Officers fired their weapons at Mr. Setzer, Mr. Setzer did not use nor display imminent use of physical force against Defendant Officers or against bystanders.

230. Mr. Setzer seeks and is entitled to recover compensatory damages for the above-described conduct.

231. As a direct and proximate result of Defendants' violations of statutes and regulations enacted for the protection of human life and safety, including the unjustified shooting of the unarmed Mr. Setzer multiple times, Plaintiff has suffered injuries and damages and is

46

entitled to recover all compensatory damages allowed by law. These include damages for Mr. Setzer's physical pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, economic losses, and all other damages recognized under North Carolina law.

## NINTH CAUSE OF ACTION
### Punitive Damages
*(As Against Defendant Officers in their Individual and Official Capacities and Defendant City of Hickory)*

232. Plaintiff re-alleges and re-incorporates the foregoing paragraphs as if fully set forth herein.

233. As a direct and proximate result of the grossly negligent, reckless, intentional and willful conduct of Defendants Steele, Travis, and Shamseldin, as well as their conscious disregard of the health and safety of Mr. Setzer, and other members of the law abiding public as alleged herein, Plaintiff is entitled to recover punitive and exemplary damages under both federal and state law to punish Defendants for their illegal, egregiously wrongful, reckless, willful, and/or wanton misconduct and to determine such conduct by others.

234. Plaintiff is entitled to recover punitive damages from Defendants, jointly and severally, in an amount later to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that the Court enter judgment in her favor and against all Defendants, and award the following relief:

1. Compensatory and Consequential Damages – including, but not limited to, damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering, on all claims allowed by law, in an amount in excess of $25,000,000.00;

2. Economic Losses – on all claims allowed by law;

3. Special Damages – in an amount to be determined at trial;

47

4. Wrongful Death Damages pursuant to N.C. Gen. Stat. § 28A-18-2, including, without limitation:

    a. The value of support and services the deceased person would have provided to the surviving family member(s);

    b. Loss of companionship, guidance, and protection provided by the deceased person;

    c. Mental and emotional pain and suffering due to the loss of a child;

    d. Medical and funeral expenses paid by any surviving family member;

    e. Damages recoverable by the deceased person's estate, including lost wages, benefits, and other earnings, the value of lost earnings the deceased person could reasonably have been expected to make had he or she lived, lost "prospective net accumulations" of the estate, and medical or funeral expenses paid directly by the estate;

5. Damages allowed pursuant to N.C. Gen. Stat. § 28A-18-1;

6. Punitive/Exemplary Damages – on all claims allowed by law against all Defendants, in an amount in excess of $1,000,000.00;

7. Attorneys' Fees and Costs – including expert witness fees, pursuant to 42 U.S.C. § 1988 and any other applicable law, on all claims allowed by law;

8. Pre- and Post-Judgment Interest – at the lawful rate;

9. Costs of Suit – for all expenses associated with this action;

10. Any Further Relief – as this Court deems just, equitable, and appropriate.

**PLAINTIFF REQUESTS A TRIAL BY JURY**

*(Signatures on next page)*

48

This the 13th day of August, 2025.

/s/ M. Anthony Burts II
M. Anthony Burts II
Attorney for Plaintiffs
N.C. State Bar No.: 49878
PO Box 102
Newton, NC 28658
Telephone: (704) 751-0455
Facsimile: (704) 413-3882


/s/ Justin Ramey
Justin Ramey
Attorney for Plaintiffs
N.C. State Bar No.: 47133
PO Box 1462
Newton, NC 28658
Telephone: (828) 382-8229
Facsimile: (980) 243-7066

/s/ Kathryn Roseman
Kathryn Roseman
Attorney for Plaintiffs
N.C. State Bar No.: 62632
PO Box 102
Newton, NC 28658
Telephone: (704) 751-0455
Facsimile: (704) 413-3882


/s/ Micheal L. Littlejohn, Jr.
Micheal L. Littlejohn, Jr.
Attorney for Plaintiffs
N.C. State Bar No.: 49353
227 W. 4th Street
Charlotte, NC 28202
Telephone: (704) 322-4581
Facsimile: (704) 625-9396

FILED

2025 AUG 13 P 12: 46

CATAWBA CO., C.S.C.

BY

# Exhibit A

CC: 000 D559

*4C002 31N15610 4485 *M: 04 I: 000 T: 001


**TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

**COMMERCIAL GENERAL LIABILITY
COVERAGE PART DECLARATIONS**

**POLICY NO.:** ZLP-31N15610-23-PB

**ISSUE DATE:** 07/20/23

**INSURING COMPANY:** The Charter Oak Fire Insurance Co

**DECLARATIONS PERIOD:** From 07/01/23 to 07/01/24 12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial General Liability Coverage Part consists of these Declarations and the Coverage Form shown below.

### 1. COVERAGE AND LIMITS OF INSURANCE:

| COMMERCIAL GENERAL LIABILITY COVERAGE FORM | LIMITS OF INSURANCE |
|---|---|
| General Aggregate Limit (Other than Products-Completed Operations) | $3,000,000 |
| Products-Completed Operations Aggregate Limit | $3,000,000 |
| Personal & Advertising Injury Limit | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Damage To Premises Rented to You Limit (any one premises) | $100,000 |
| Medical Expense Limit (any one person) | $EXCLUDED |

### 2. AUDIT PERIOD:

### 3. FORM OF BUSINESS: SEE COMMON POLICY DECLARATIONS

### 4. NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.

SEE IL T8 01

**COMMERCIAL GENERAL LIABILITY COVERAGE
IS SUBJECT TO A GENERAL AGGREGATE LIMIT**

PRODUCER: LEGACY INS PARTNERS INC

OFFICE: San Antonio

CG TO 01 11 03

Page 1 of 1


**TRAVELERS**

One Tower Square, Hartford, Connecticut 06183

| POLICY DECLARATIONS | POLICY NO.: ZUP-51N17149-23-PB |
|---|---|
| EXCESS FOLLOW—FORM AND UMBRELLA | ISSUE DATE: 07/15/23 |
| LIABILITY INSURANCE POLICY | |

**INSURING COMPANY:** TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

**1. NAMED INSURED AND MAILING ADDRESS:**

CITY OF HICKORY
P.O. BOX 398
HICKORY NC 28603

**2. POLICY PERIOD:** From 07/01/2023 to 07/01/2024 12:01 A.M. Standard Time at your mailing address.

**3. LIMITS OF INSURANCE:**

| COVERAGES | LIMITS OF LIABILITY | |
|---|---|---|
| AGGREGATE LIMITS OF LIABILITY | $8,000,000 | General Aggregate |
| | $8,000,000 | Products—Completed Operations Aggregate |
| EXCESS FOLLOW—FORM AND UMBRELLA LIABILITY | $8,000,000 | Occurrence Limit |
| CRISIS MANAGEMENT SERVICE EXPENSES | $50,000 | all Crisis Management Events |

**4. SELF INSURED RETENTION:** $10,000    any one occurrence or event

**5. PREMIUM:** $53,420.00    ☒ Flat Charge    ☐ Adjustable (See Premium Schedule)

**6. TAXES AND SURCHARGES: $**

**7.** On the effective date shown in Item **2.**, the Excess Follow-Form And Umbrella Liability Insurance Policy numbered above includes this Declarations Page and any forms and endorsements shown on the Listing Of Forms, Endorsements And Schedule Numbers.

**8.** If the Schedule Of Underlying Insurance includes any coverage provided on a claims-made basis, then the following disclaimer applies.

## COVERAGE WILL APPLY ON A CLAIMS-MADE BASIS WHEN FOLLOWING CLAIMS-MADE UNDERLYING INSURANCE.

**9.** If the Schedule Of Underlying Insurance includes any coverage which includes defense expenses within the limits of liability, then the following disclaimer applies:

## DEFENSE EXPENSES ARE PAYABLE WITHIN, AND ARE NOT IN ADDITION TO, THE LIMITS OF INSURANCE WITH RESPECT TO SOME OR ALL OF THE COVERAGES PROVIDED.

| NAME AND ADDRESS OF AGENT OR BROKER: | COUNTERSIGNED BY: |
|---|---|
| LEGACY INS PARTNERS INC | |
| P.O. BOX 3858 | _____ |
| HICKORY NC 28603 | **Authorized Representative** |
| | Date:_____ |

**OFFICE:** SANSOUTH

EU 00 02 09 20     © 2020 The Travelers Indemnity Company. All rights reserved.     Page 1 of 1

FILED

2025 AUG 13 P 12: 47

CATAWBA CO., C.S.C.

BY

# Exhibit B



## Wake Forest®
### Baptist Medical Center

### Laboratory Result Report

**Patient: Setzer, Timothy Jr.**
**MRN: 175168**
**DOB/Age: 7/11/1996  (27 yrs)**
**Sex: Male**
**CSN:**

**Autopsy Report** (Final result)                              WFAM23-01066

| Authorizing Provider: | O'Neill, Tiffany Erin, DO | Ordering Provider: | O'Neill, Tiffany Erin, DO |
| Pathologist: | O'Neill, Tiffany Erin, DO | | |

Staff Pathologist:  O'Neill, Tiffany Erin, DO

Autopsy Assistant:  Spencer, Edward Nathan Jr.

Expired: 8/13/2023
Autopsied: 8/16/2023
Reported: 3/19/2024

**Aut ME Medical Examiner**
CHRIS RICHARDSON,EMT-P
CATAWBA COUNTY

### FINAL DIAGNOSIS

I. Gunshot wound of head, without exit, indeterminate range (labeled "A"):
    a. Entrance gunshot wound at top of head
    b. Perforation of left frontal lobe
    c. 81.2 grain, markedly deformed, partially jacketed projectile recovered from the left frontal lobe
    d. Trajectory; Downward
II. Gunshot wound of torso, without exit, indeterminate range (labeled "U"):
    a. Entrance gunshot wound at left upper back
    b. Perforation of left lung and spleen
    c. 145.8 grain, moderately deformed, partially jacketed projectile recovered from the mid left back
    d. Trajectory; downward
III. Gunshot wound of right abdomen, without exit, indeterminate range (labeled "F"):

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |

Report Printed on: 3/21/2024  10:04 AM

1 of 14



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

    a. Entrance gunshot wound at inferior right chest
    b. Perforation of liver and stomach
    c. 145.6 grain, moderately deformed, partially jacketed projectile recovered from the omentum adjacent to the stomach
    d. Trajectory front-to-back, right-to-left and downward

IV. Gunshot wound of lower abdomen, with exit, indeterminate range (labeled "G" and "H"):
    a. Entrance gunshot wound at central lower abdomen
    b. Perforation of skin and subcutaneous tissue
    c. Exit gunshot wound at central lower abdomen
    d. Trajectory right-to-left

V. Gunshot wound of lateral left abdomen, with exit, indeterminate range (labeled "V" and "Q"):
    a. Entrance gunshot wound at left lower back
    b. Perforation of skin, subcutaneous tissue and muscle
    c. Exit gunshot wound at lateral left abdomen
    d. Trajectory; back-to-front and right-to-left

VI. Gunshot wound of right shoulder, with exit, indeterminate range (labeled "B" and "C"):
    a. Entrance gunshot wound at anterior right shoulder
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at lateral right shoulder
    d. Trajectory; left-to-right and downward

VII. Gunshot wound of right forearm, with exit, indeterminate range (labeled "E" and "D"):
    a. Entrance gunshot wound at distal anterior right forearm
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at mid posterior right forearm
    d. Trajectory; front-to-back, right-to-left and upward

VIII. Gunshot wound of left shoulder, with exit, indeterminate range (labeled "O" and "P"):
    a. Entrance gunshot wound at anterior left shoulder
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at left axilla
    d. Trajectory; front-to-back, left-to-right and downward

IX. Gunshot wound of right buttock, with exit, indeterminate range (labeled "Z" and "W"):
    a. Entrance gunshot wound at proximal posterior right thigh
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at superior right buttock
    d. Trajectory; upward

X. Gunshot wound of right buttock, with exit, indeterminate range (labeled "Y" and "X"):
    a. Entrance gunshot wound at proximal posterior right thigh
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at mid right buttock
    d. Trajectory; upward

XI. Gunshot wound of right thigh, with exit, indeterminate range (labeled "I" and "J"):
    a. Entrance gunshot wound at distal anterior right thigh
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at distal anterior right thigh
    d. Trajectory; front-to-back, left-to-right and slightly downward

XII. Gunshot wound of right foot, with exit, indeterminate range (labeled "K" and "N"):
    a. Entrance gunshot wound at lateral right foot
    b. Perforation of skin and soft tissue
    c. Exit gunshot wound at plantar right foot

## Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|



d. Trajectory; right-to-left, front-to-back and downward

XIII. Gunshot wound of right foot, with exit, indeterminate range (labeled "L" and "M"):
    a. Entrance gunshot wound at lateral right foot
    b. Perforation of skin, soft tissue, tarsal (cuneiform) bone
    c. Exit gunshot wound at medial right foot
    d. Trajectory; right-to-left, front-to-back and upward

XIV. Gunshot wound of right lower leg, with exit, indeterminate range (labeled "AA" and "BB"):
    a. Entrance gunshot wound at mid posterior right lower leg
    b. Perforation of skin, soft tissue and muscle
    c. Exit gunshot wound at mid posterior right lower leg
    d. Trajectory; left-to-right, back-to-front, and slightly upward

XV. Gunshot wound of left thigh and pelvis, with exit and re-entrance, indeterminate range (labeled "S" and "R"):
    a. Entrance gunshot wound at mid anterior left thigh
    b. Perforation of skin and soft tissue
    c. Exit gunshot wound and re-entrance gunshot wound at proximal anterior left thigh
    d. Perforation of skin, soft tissue, and muscle, left side of pelvis
    e. 148.2 grain, moderately, deformed, partially jacketed projectile recovered from the left side of the pelvis
    f. Trajectory; front-to-back and upward

XVI. Graze wound, right thigh

XVII. Graze wound, left thigh

XVIII. 16 grain projectile fragment recovered from the pants

XIX. 147.8 grain, moderately deformed, partially jacketed projectile recovered from the body bag

XX. 150.2 grain moderately deformed, partially jacketed projectile recovered from the sweatshirt/jacket

XXI. 148 grain moderately deformed, partially jacketed projectile recovered from the left shoe
    a. Associated laceration of the left foot

XXII. 148.2 grain moderately deformed, partially jacketed projectile recovered from the tank top

Electronically signed by O'Neill, Tiffany Erin, DO on 3/19/2024 at 1620

## SUMMARY OF FINDINGS

The cause of death is multiple gunshot wounds. The manner of death is homicide.

Major findings at autopsy included 15 separate gunshot wound pathways. One pathway went through the front of the brain and a projectile was recovered from the brain. One pathway went through the left lung and spleen and a projectile was recovered from the back. One pathway went through the liver and stomach and a projectile was found next to the stomach. One pathway entered at the left thigh and a projectile was recovered from the left side of the pelvis. One pathway went through the foot and fractured a bone. The remainder of the wound pathways predominately went through skin, soft tissue and muscle. Two graze wounds were on the lower extremities. Four projectiles and a fragment were recovered from the clothing and body bag. Postmortem toxicologic analysis of blood detected ethanol, Delta-9-THC, and Delta-9 Carboxy THC.

According to the Catawba County Medical Examiner, the decedent was shot by on-duty law enforcement officials after he pulled a handgun from his waistband during a pursuit.

## Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
| --- | --- |

Case 5:25-cv-00154-SCR-UMJ    Document 1-1    Filed 09/24/25    Page 60 of 88



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

## EXTERNAL EXAMINATION
Body Weight: 180 lb
Body Length: 71 in

*A representative from the North Carolina State Bureau of Investigation is present for the autopsy.*

The body is that of a well-developed, well-nourished, adult Caucasian man, who appears compatible with the stated age. Body identification includes an identification tag on the body bag.

The body is received clothed in a black belt, blue jeans, two white socks, a black jacket, a multicolored shirt, a blue tank top, blue underwear, and two brown socks. Personal effects accompanying the body include a gray metal necklace, multiple keys, a black knife sheath, black holster, and a black magazine holster.

The body is cold to the touch. Rigor is fully fixed in the extremities and jaw. Diffuse, fixed, red-purple livor extends over the posterior surfaces of the body, except in areas subject to pressure. The body has multiple yellow dried abrasions with associated ants.

The scalp hair is shaved. The irides appear brown; the pupils are symmetrical. The corneae are transparent. The sclerae and conjunctivae are pale. The nose and ears are not unusual. The lips and gums are pale. The teeth are in adequate condition. Facial hair consists of a brown goatee. The neck is without masses and the larynx is in the midline.

The thorax is symmetrical. The abdomen is flat. The external genitalia are those of an adult male; the testes are descended within the scrotum. The anus and back have no unusual features. The upper and lower extremities are well-developed and symmetrical without absence of digits.

Identifying marks and scars are not apparent.

## EVIDENCE OF INJURY
***The gunshot wounds are labeled and listed below for recording purposes only and do not indicate the sequence or severity of the wounds.***

HEAD AND NECK

### GUNSHOT WOUND OF HEAD (LABELED "A" ON CHARTS AND DIAGRAMS):
At the top of the head and at the midline is a 2 x 1 /2 inch irregular laceration. The posterior portion/12:00 position of the wound is rounded and has a 1/8 inch red marginal abrasion, consistent with an atypical entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the frontal scalp, the left side of the frontal bone creating an irregular defect with internal and external beveling, the dura, and the left frontal lobe. Associated injuries include subarachnoid hemorrhage of the superior frontal and parietal lobes and skull fractures.

An 81.2 grain, markedly deformed, partially jacketed projectile with base diameter of 5/16 inch is recovered from the left frontal lobe.

## Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM

4 of 14



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

The trajectory is downward.

### POSTMORTEM RADIOGRAPHS:
Radiographs of the head show the projectile recovered at autopsy.

### BLUNT FORCE INJURIES:
Multiple red abrasions up to 3/4 x 1/2 inch are on the forehead and adjacent to the eyes.

CHEST AND ABDOMEN

### GUNSHOT WOUND OF TORSO (LABELED "U"):
On the left upper back, 10 inches below the top of the head, 2 1/4 inches left of the posterior midline is a 5/16 inch in diameter ovoid defect with a 1/16 inch in width circumferential red marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the the skin, soft tissue and musculature of the left upper back, the left posterior 2nd rib, the upper lobe of the left lung, the lower lobe of the left lung, the diaphragm, the spleen, the peritoneal cavity beneath the left posterior 12th rib, and the soft tissue of the left mid back. Associated injuries include a hemoperitoneum (100ml) and a left hemothorax (1600 ml).

A 145.8 grain, moderately, deformed, partially jacketed projectile with base diameter of 5/16 inch is recovered from the soft tissue of the mid left back.

The trajectory is downward.

### GUNSHOT WOUND OF RIGHT ABDOMEN (LABELED "F"):
On the inferior right chest, 24 inches below the top of the head, 7 1/2 inches right of the anterior midline is a 3/4 inch in diameter ovoid defect with a 1/4 inch in width red marginal abrasion at the 10:00 to 12:00 position and 1/16 inch marginal abrasion at the 6:00 position, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin and soft tissue of the inferior right chest, the right lateral 8th intercostal space, the diaphragm, right lobe of the liver, the stomach, and omentum. Associated injuries include a hemoperitoneum (100 ml) and a right hemothorax (100 ml).

A 145.6 grain, moderately, deformed, partially jacketed projectile with base diameter of 5/16 inch is recovered from the omentum adjacent to the stomach.

The trajectory is from the decedent's front-to-back, right-to-left and downward.

### GUNSHOT WOUND OF LOWER ABDOMEN (LABELED "G" AND "H"):
On the central lower abdomen, 29 inches below the top of the head, 2 3/4 inches right of the anterior midline is a 1/4 inch in diameter round defect with a 1/2 inch in width dried abrasion at the 9:00 position, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
| --- | --- |



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**
gunshot wound.

The hemorrhagic wound track sequentially perforates the skin and subcutaneous tissue.

On the central lower abdomen, 29 inches below the top of the head, 1/4 inch right of the anterior midline is a 1/2 inch irregular laceration with dried edges from the 12:00 to 6:00 position consistent with an exit gunshot wound.

A 1 1/2 inch dried yellow-red abrasion with a 3/16 perforation of the skin is between the entrance and exit wounds.

The trajectory is from the decedent's right-to-left.

### GUNSHOT WOUND OF LATERAL LEFT ABDOMEN (LABELED "V" AND "Q"):
On the left lower back, 28 inches below the top of the head, 1 1/2 inches left of the posterior midline is a 5/16 inch in diameter round defect with a 1/16 inch in width red circumferential marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, subcutaneous tissue and muscle of the lateral left back and abdomen.

On the lateral left abdomen, 29 inches below the top of the head, 6 inches left of the anterior midline is a 1/2 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound. Adjacent to the wound are two red-yellow 3 inch horizontal abrasions consistent with insect (ant) activity.

The trajectory is from the decedent's back-to-front and right-to-left.

### CLOTHING:
Two defects, up to 3/4 inch, are on the front panel of the underwear. Four defects, up to 3/4 inch, are on the back panel of the underwear.

The jeans have multiple frayed defects up to 1 3/4 inch on the front panel and up to 1 1/2 inch on the back panel. A 16 grain gray metal fragment is on the front left side.

The sweatshirt has multiple frayed defects on the front panel, several defects on the back panel and several defects on the sleeves. The tank top and T-shirt similarly have multiple defects on the front panel and back panel. A 150.2 grain moderately deformed, partially jacketed projectile with a base diameter of 5/16 inch is recovered from the sweatshirt/jacket. A 148.2 grain moderately deformed, partially jacketed projectile with a base diameter of 5/16 inch is recovered from the lower front of the tank top.

The shoes and socks have multiple frayed defects corresponding to the entrance and exit wounds. A 148 grain moderately deformed, partially jacketed projectile with a base diameter of 5/16 inch is recovered from the left shoe.

A 147.8 grain, moderately deformed, partially jacketed projectile with a base diameter of 5/16 inch is recovered from the body bag.

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

### POSTMORTEM RADIOGRAPHS:
Radiographs of the chest, abdomen, and pelvis show the projectiles recovered at autopsy and multiple smaller fragments which are not recovered.

### BLUNT FORCE INJURIES:
A 2 x 2 inch red-purple contusion is on the lateral left chest near the axilla.

UPPER EXTREMITIES

### GUNSHOT WOUND OF RIGHT SHOULDER (LABELED "B" AND "C"):
On the anterior right shoulder, 10 inches below the top of the head, at the lateral arm midline is a 5/16 inch in diameter round defect with a 1/16 inch in width circumferential red marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right shoulder.

On the lateral right shoulder, 11 inches below the top of the head, 1 1/2 inches posterior to the lateral arm midline is a 1/2 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is from the decedent's left-to-right and downward.

### GUNSHOT WOUND OF RIGHT FOREARM (LABELED "E" AND "D"):
On the distal anterior right forearm, inches 21 below the top of the shoulder, 1 inches left of the anterior arm midline is a 1/2 inch in diameter round defect with a 1/8 inch to 1/4 inch (6:00 position) in width circumferential pink marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound. Multiple small irregular dried red abrasions are around the wound most consistent with postmortem insect activity.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right forearm.

On the mid posterior right forearm, 18 inches below the top of the shoulder, 2 inches left of the posterior arm midline is a 1/2 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound. A 1/4 inch abrasion is at the 12:00 position.

The trajectory is from the decedent's front-to-back, right-to-left and upward.

### GUNSHOT WOUND OF LEFT SHOULDER (LABELED "O" AND "P"):
On the anterior left shoulder, 11 1/2 inches below the top of the head, 8 inches left of the anterior midline is a 5/16 inch in diameter round defect with a 1/16 inch in width circumferential red marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the left

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM

7 of 14



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

shoulder.

Within the left axilla, 5 inches below the top of the shoulder, at the medial left arm midline is a 1 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is from the decedent's front-to-back, left-to-right and downward.

### POSTMORTEM RADIOGRAPHS:
Radiographs of the right upper extremity and left shoulder show no projectiles.

### OTHER INJURIES:
A 1 x 1 inch red-purple contusion is on the right elbow. A 1/2 inch laceration is on the the palm of the right hand.

LOWER EXTREMITIES

### GUNSHOT WOUND OF RIGHT BUTTOCK (LABELED "Z" AND "W"):
On the proximal posterior right thigh, 40 inches below the top of the head, 1 3/4 inches right of the posterior thigh midline is a 1/2 inch in diameter round defect with a 1/2 inch in width red, dried abrasion at the 6:00 position, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right buttock.

On the superior right buttock, 33 inches below the top of the head, 5 inches right of the posterior midline is a 5/16 inch round laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is upward.

### GUNSHOT WOUND OF RIGHT BUTTOCK (LABELED "Y" AND "X"):
On the proximal posterior right thigh, 38 inches below the top of the head, 1 inches right of the posterior thigh midline is a 5/16 inch in diameter round defect with a 1/2 inch in width red, dried abrasion at the 7:00 position, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right buttock.

On the mid right buttock, 35 inches below the top of the head, 4 3/4 inches right of the posterior midline is a 5/16 inch round laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is upward.

### GUNSHOT WOUND OF RIGHT THIGH (LABELED "I" AND "J"):
On the distal anterior right thigh, 48 inches below the top of the head, 2 inches left of the anterior thigh midline is a 1/2 inch in diameter ovoid defect with a 1/16 inch in width pink marginal abrasion from 12:00 to

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM

8 of 14



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

6:00, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right thigh.

On the distal anterior right thigh, 49 inches below the top of the head, 2 1/4 inches right of the anterior thigh midline is a 1/4 inch linear laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is from the decedent's front-to-back, left-to-right and slightly downward.

### GUNSHOT WOUND OF RIGHT FOOT (LABELED "K" AND "N"):
On the lateral right foot, 71 inches below the top of the head, 1 inches right of the dorsal foot midline is a 1/4 inch in diameter round defect without marginal abrasion, consistent with an atypical entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin and soft tissue of the right foot.

On the plantar right foot, 71 inches below the top of the head, 3/4 inches left of the ventral foot midline is a 1/2 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is from the decedent's right-to-left, front-to-back and downward.

### GUNSHOT WOUND OF RIGHT FOOT (LABELED "L" AND "M"):
On the lateral right foot, 71 inches below the top of the head, 1/2 inch right of the dorsal foot midline is a 1/4 inch in diameter round defect with a 1/16 inch red marginal abrasion, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue, and tarsal (cuneiform) bone of the right foot.

On the medial right foot, 71 inches below the top of the head, 2 inches left of the dorsal foot midline is a 2 inch irregular laceration without marginal abrasion consistent with an exit gunshot wound.

The trajectory is from the decedent's right-to-left, front-to-back and upward.

### GUNSHOT WOUND OF LEFT THIGH AND PELVIS (LABELED "S" AND "R"):
On the mid anterior left thigh, 41 inches below the top of the head, 4 inches right of the anterior thigh midline is a 5/16 inch in diameter round defect with a 1/2 inch in width red, dried abrasion at the 6:00 position, consistent with an entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin and soft tissue of the left thigh.

On the proximal anterior left thigh, 38 1/2 inches below the top of the head, 4 inches right of the anterior thigh midline is a 1 inch ovoid laceration without marginal abrasion consistent with an exit gunshot wound. At the

### Resulting Labs

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM
14

9 of



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

proximal end of the laceration is a defect consistent with an atypical re-entrance wound. Small fragments of clothing are within the wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the left thigh, and penetrates the anterior left side of the pelvis. Associated injuries include a graze wound of the left side of the scrotum.

A 148.2 grain, moderately, deformed, partially jacketed projectile with base diameter of 5/16 inch is recovered from the left side of the pelvis.

The trajectory is from the decedent's front-to-back and upward.

### GUNSHOT WOUND OF RIGHT LOWER LEG (LABELED "AA" AND "BB"):
On the mid posterior right lower leg, 58 1/2 inches below the top of the head, 3/4 inches right of the posterior lower leg midline is a 1/2 inch in diameter round defect without marginal abrasion, consistent with an atypical entrance gunshot wound. Soot is not visible on the skin edges or within the hemorrhagic wound track. No stippling or unburned or burned gunpowder particles are on the skin surrounding the entrance gunshot wound.

The hemorrhagic wound track sequentially perforates the skin, soft tissue and musculature of the right lower leg.

On the mid posterior right lower leg, 57 inches below the top of the head, 1 inches right of the posterior low leg midline is a 1 inch round laceration with a 1/8 inch marginal abrasion from 12:00 to 6:00, consistent with a shored exit gunshot wound. Review of clothing shows no defect corresponding to this wound making it more likely to be the exit wound.

The trajectory is left-to-right, back-to-front, and slightly upward.

### GRAZE WOUND OF LEFT THIGH (LABELED "T"):
On the mid anterior left thigh, 40 inches below the top of the head, 1 1/4 inches left of the anterior thigh midline is a 3/4 inch ovoid deep horizontal graze wound into soft tissue.

### GRAZE WOUND OF RIGHT THIGH:
On the medial right thigh, starting at 44 inches below the top of the head, is an 8 inch vertical graze wound. An adjacent 3/4 inch yellow abrasion is inferior to it.

### OTHER INJURIES:
A 1/2 inch laceration is on the lateral left foot which has a corresponding defect in the sock and likely represents a projectile injury from the projectile in the shoe.

### POSTMORTEM RADIOGRAPHS:
Radiographs of the lower extremities show minute fragments in the right foot.

### BLUNT FORCE INJURIES:
On the mid anterior left thigh are three abraded contusions up to 1/2 inch. The left knee and proximal anterior left lower leg have multiple red-purple contusions up to 1 1/2 x 1 1/2 inch. The right knee has multiple red-purple contusions up to 1 x 1 inch. The medial right ankle has a 2 x 1 inch red-purple contusion.

**Resulting Labs**

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM
14

10 of



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

**INTERNAL EXAMINATION**
BODY CAVITIES
Panniculus adiposus: 1 cm

The pleural and abdominal cavities contain no fibrous adhesions. All body organs are present in normal and anatomical position.

CENTRAL NERVOUS SYSTEM
Brain weight: 1660 gm

The cerebral hemispheres are asymmetrical due to injury. The structures at the base of the brain, including cranial nerves and blood vessels, are intact and free of abnormality. The arteries of the Circle of Willis are in the usual anatomical configuration and are patent. Sections through the cerebral hemispheres reveal no non-traumatic lesions within the cortex, subcortical white matter, or deep parenchyma of either hemisphere. The basal ganglia, thalami, and Ammon's horn have no unusual features. The cerebral ventricles are lined by glistening ependyma and of are of normal caliber. Sections through the brain stem and cerebellum reveal no lesions. The substantia nigra and locus ceruleus have age appropriate pigmentation. The cerebral aqueduct is patent and the fourth ventricle is not dilated.

NECK

The soft tissues of the neck, including strap muscles, and large vessels, have no abnormalities. The hyoid bone and laryngeal structures are intact and the adjacent musculature has no areas of extravasated blood. The lingual mucosa is intact; the underlying firm red-brown musculature is devoid of hemorrhage.

CARDIOVASCULAR SYSTEM
Heart weight: 330 gm

The pericardial surfaces are smooth and glistening; the pericardial sac is free of significant fluid or adhesions. The coronary arteries arise normally, follow the usual distribution of a right-dominant pattern and are widely patent, without significant atherosclerosis or thrombi. The chambers and valves bear the usual size-position relationships. The myocardium is dark red-brown and firm; the ventricular septum is intact. A patent foramen ovale is present. The thicknesses of the ventricular walls are: left ventricle 1.1 cm; interventricular septum 1 cm; right ventricle 0.3 cm. The aorta and its major branches arise normally, follow the usual course and are widely patent, free of significant atherosclerosis and other abnormality. The vena cava and its major tributaries return to the heart in the usual distribution and are free of thrombi.

RESPIRATORY SYSTEM
Right lung weight: 570 gm
Left lung weight: 290 gm

The upper airway is clear of debris and foreign material; the mucosal surfaces are smooth and yellow-tan. The pleural surfaces are smooth and glistening, aside from noted injuries. Lobar divisions are of the usual configuration. The pulmonary parenchyma is dark red-purple, exuding slight to moderate amounts of blood and frothy fluid. The pulmonary arteries are normally developed, patent, and without thrombus or embolus.

LIVER AND BILIARY SYSTEM
Liver weight: 1660 gm

**Resulting Labs**

| **WC Lab** | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**
Bile volume: 10 mL

Aside from noted injuries, the hepatic capsule is smooth and glistening, covering red-brown parenchyma with no focal lesions. The gallbladder contains green-yellow, slightly mucoid bile; the mucosa is velvety. The extrahepatic biliary tree contains no calculi. The portal vein and its tributaries are patent.

ALIMENTARY TRACT

The esophagus is lined by gray-white, smooth mucosa. The gastric mucosa is arranged in the usual rugal folds, and the lumen has scant brown mucoid material. The serosa of the small and large bowel is smooth and glistening. The appendix is present. The pancreas has a gray-tan, lobulated appearance and the ducts are unobstructed.

GENITOURINARY TRACT
Right kidney: 140 gm
Left kidney: 120 gm
Urine volume: 220 mL

The renal capsules are smooth and thin, semi-transparent, and strip with ease from the underlying, smooth, red-brown, firm, cortical surface. The cortex is sharply delineated from the medullary pyramids, which are red-purple to tan. The calyces, pelves, and ureters are not dilated. The relationships at the trigone are arranged in the usual anatomical configuration. The mucosa of the urinary bladder is gray-tan and smooth. The prostate and seminal vesicles have no abnormal findings.

RETICULOENDOTHELIAL SYSTEM
Spleen weight: 150 gm

Aside from noted injuries, the spleen has a smooth capsule covering red-purple, soft parenchyma; the lymphoid follicles are indistinct. The regional lymph nodes appear normal. The bone marrow is red-purple and homogeneous, without focal abnormality.

ENDOCRINE SYSTEM

The pituitary, thyroid, and adrenal glands contain no lesions.

MUSCULOSKELETAL SYSTEM

Aside from noted injuries, the bony framework, supporting musculature, and soft tissues are not unusual.

**MICROSCOPIC DESCRIPTION**
No histologic sections are taken for this case.

**EVIDENCE**
Evidence turned over to the North Carolina State Bureau of Investigation during the autopsy includes the body bag seals, pulled pubic hair, a blood spot card, tthe decedent's belongings and clothing, and the projectiles and projectile fragments.

**Resulting Labs**

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024 10:04 AM
14

12 of



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

**Toxicology Results**
Toxicology Folder:    T202309874
Case Folder:    F202310608

Status of Report: Approved
Report Electronically Approved By: Sandra Bishop-Freeman, PhD

==================================================================
SPECIMENS received from Tiffany E. O'Neill on 18-aug-2023

S230029951: 20.0 ml Blood    CONDITION: Postmortem
    SOURCE: Left Pleural Cavity    OBTAINED: 16-aug-2023

** Comments Concerning This Specimen **
    Unless otherwise noted, all testing on this specimen was
    performed by NMS Labs. The Test Panel includes abused and
    therapeutic drugs, some of which are not tested at OCME (THC,
    LSD) but the results must be reported. Other drugs may
    appear due to add-on testing directed by OCME. Contact the
    lab for a full list.
** End of Comments Concerning This Specimen **

11-Hydroxy-THC -------------- None Detected    12/14/2023
Delta-9 Carboxy THC ---------------------- 13  ng/mL    12/14/2023
Delta-9-THC ----------------------------- 4.4  ng/mL    12/14/2023
Ethanol --------------------------------- 310  mg/dL    12/14/2023

** Comments Concerning This Result **
    Analysis was performed by OCME.
** End of Comments Concerning This Result **

Organic Bases --------------- None Detected    12/14/2023
Other Organic Acids/Neutrals None Detected    12/14/2023

---

S230029952: 18.0 ml Urine    CONDITION: Postmortem
    SOURCE: Urinary Bladder    OBTAINED: 16-aug-2023

---

S230029953:    Liver    CONDITION: Postmortem
    SOURCE: Liver    OBTAINED: 16-aug-2023

---

S230029954: 4.0 ml Vitreous Humor    CONDITION: Postmortem
    SOURCE: Eye    OBTAINED: 16-aug-2023

**Resulting Labs**

| | |
|---|---|
| **WC Lab** | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |

Report Printed on: 3/21/2024 10:04 AM    13 of
14



**Patient: Setzer, Timothy Jr.**
**MRN: 175168**

Ethanol --------------------------------- 250    mg/dL                    12/14/2023

Accredited by the American Board of Forensic Toxicology, Inc.

121423 10:05     *** E N D   O F   R E P O R T ***

**MEDICAL THERAPY**
No evidence of emergency resuscitation and/or medical therapy is present.

**Specimens**
A     Autopsy

**\*\*\*END OF REPORT\*\*\***

**Resulting Labs**

| WC Lab | NC BAPTIST HOSPITALS INC PATHOL LABS, CLIA# 34D0664386, Medical Center Boulevard, Winston-Salem NC 27157 |
|---|---|

Report Printed on: 3/21/2024  10:04 AM
14

14 of

FILED

2025 AUG 13 P 12: 47

CATAWBA CO., C.S.C.

BY _____

# Exhibit C

Case 5:25-cv-00154-SCR-UMJ     Document 1-1     Filed 09/24/25     Page 72 of 88















# STATE OF NORTH CAROLINA

___Catawba___ County

FILED

2025 AUG 15 P 1:32

CATAWBA CO. CSC

BY _____

File No.

25-CVS-2595

In The General Court Of Justice
Superior Court Division

## IN THE MATTER OF
## CUSTODIAL LAW ENFORCEMENT AGENCY
## RECORDING SOUGHT BY:

Name Of Petitioner
Christina Tolley, Administrator of the Estate of Timothy Setzer

Address
c/o M. Anthony Burts II
PO Box 102

City, State, Zip
Newton, NC 28658

| Phone No. | Fax No. |
|---|---|
| (704)751-0455 | (704) 413-3882 |

Email Address
anthony@burtslaw.com

## PETITION FOR RELEASE OF
## CUSTODIAL LAW ENFORCEMENT AGENCY
## RECORDING

G.S. 132-1.4A(f) – petition by person authorized to receive disclosure or custodial law enforcement agency (no filing fee applies)

Spoken Language Court Interpreter Needed For Any Party, Victim, Or Witness? (If Yes, identify person(s) and language(s). Interpreters provided for all court proceedings at no cost.)

[X] No   [ ] Yes: (explain)

I, the above-named petitioner, request the release of a custodial law enforcement agency recording to
Christina Tolley
_____, state that at least some portion of the law enforcement agency

recording was made in this county, and I further state the following:

Petitioner is personal representative of the deceaseed person whose image is in the relevant recordings. She respectfully requests an order authorizing the release of custodial law enforcement recordings related to the fatal shooting of Timothy Craig Setzer Jr. by Hickory police officers on August 13, 2023.

Hickory Police Department possesses four (4) body-worn and/or dashboard camera video(s) and audio(s) ("BWC") depicting the incident. The requsted BWC files from Officers Faison, Travis, Shamseldin, Steele are labled as follows: Axon Body 3 X60A8166F; Axon Body 3 X60A8087J; Axon Body 3 X60A8777J; and Axon Body Cam 3 X60A6453Q.

The BWCs shows Mr. Setzer running away, and the audio captures the number of gunshots fired even after he was down and motionless. An officer is also depicted firing his weapon from a moving patrol vehicle, immediately upon arriving on the scene.

(Include date and approximate time of activity captured in the recording, or otherwise identify the activity with particularity sufficient to identify the recording at issue.)

## NOTICE TO
## HEAD OF CUSTODIAL LAW ENFORCEMENT AGENCY

I certify that a filed copy of this Petition was provided to the head of the custodial law enforcement agency as follows:

[ ] Personal Delivery

[X] By Regular Mail, US postage prepaid, addressed as follows:
Chief Bryan Adams
76 North Center Street
Hickory, NC 28601

[ ] Other: (explain)

| Date | Petitioner's Signature |
|---|---|
| 08/15/2025 | |

AOC-CV-270, Rev. 7/24
© 2024 Administrative Office of the Courts

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF CATAWBA                SUPERIOR COURT DIVISION
                                 File No. 25-CVS-2625

In Re:                      :
Estate of Timothy Setzer, Jr. :   **STIPULATION FOR RELEASE OF CUSTODIAL**
                            :     **LAW ENFORCMENT AGENCY RECORDINGS**
                            :           **AND ORDER THERON**
                            :
                            :
                            :
_____     :

     IT IS HEREBY STIPULATED, by and between the parties hereto, that the Petition of the

Estate of Timothy Setzer, Jr. ("Petitioner"), for the Release of Custodial Law Enforcement Agency

Recordings of the body worn camera footage of City of Hickory Police Officers Faison, Steele,

Travis, and Shamseldin from the August 13, 2023, officer involved shooting of Timothy Setzer, Jr.

be granted and that a copy of said footage shall be provided to Petitioner, through her undersigned

counsel, on a DVD or similar medium as allowed by N.C. Gen. Stat. § 132-1.4A(1). Petitioner

contends that said release serves a compelling public interest. Petitioner and the City of Hickory

may use said recordings for any and all lawful purposes.

     This the ___ day of August, 2025.


                    _____
                    Superior Court Judge Presiding

**AGREED AND STIPULATED TO:**

_____
M. Anthony Burts II
Burts Law, PLLC
PO Box 102
Newton, North Carolina  28658
*Attorney for Plaintiffs*


_____
Timothy D. Swanson
Hickory City Attorney
PO Box 2428
Hickory, North Carolina 28603
*Attorney for City of Hickory*

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 25CVS2625

FILED
2025 AUG 19 P 1:39
CATAWBA CO., C.S.C.
BY

CHRISTINA TOLLEY, Administrator of the
Estate of Timothy Setzer,

Petitioner,

**NOTICE OF HEARING**

TAKE NOTICE HEREBY that Petitioner, Christina Tolley, Administrator of the Estate of Timothy Craig Setzer Jr., will bring on for hearing her Petition for Release of Custodial Law Enforcement Agency Recordings at the September 22, 2025, session of Civil Superior Court, Catawba County, North Carolina commencing in courtroom number 8 at 10:00 a.m. or as soon thereafter as the Court deems appropriate.

This the 19th day of August, 2025.

Burts Law, PLLC

*/s/ M. Anthony Burts II*
M. Anthony Burts II
Burts Law, PLLC
P.O. Box 102
Newton, NC 28658
T. (704) 751-0455
F. (704) 413-3882
anthony@burtslaw.com
*Attorney for Plaintiff*

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

FILED

2025 AUG 19 P 1: 38

CATAWBA CO., C.S.C.

BY_____

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.:  25CVS2625

CHRISTINA TOLLEY, Administrator of the
Estate of Timothy Setzer,

Petitioner,

**CERTIFICATE OF SERVICE**

I do hereby certify that I have this day served a copy of the foregoing Notice of Hearing

on all parties in the above-entitled action via U.S. Mail:

Attn: Chief Bryan Adams
Hickory Police Department
76 North Center Street
Hickory, NC 28601

Attn: Timothy D. Swanson
Young, Morphis, Bach & Taylor, LLP
P.O. Box 2428
Hickory, NC 28603

This the 19th day of August, 2025.

Burts Law, PLLC

*/s/ M. Anthony Burts II*
M. Anthony Burts II
Burts Law, PLLC
P.O. Box 102
Newton, NC 28658
T. (704) 751-0455
F. (704) 413-3882
anthony@burtslaw.com
*Attorney for Plaintiff*

STATE OF NORTH CAROLINA
COUNTY OF CATAWABA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

FILED

2025 SEP -2

CATAWBA CO., C.S.C.

BY

FILE NO.: 25-CVS-2595

CHRISTINA TOLLEY, as Administrator of the
ESTATE OF TIMOTHY CRAIG SETZER, JR.,

   Plaintiff,

v.

THE CITY OF HICKORY, Officer AARON
TRAVIS in his individual capacity, Officer
AUSTIN STEELE in his individual capacity, and
Officer ISAM SHAMSELDIN in his individual
capacity,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ACCEPTANCE OF
SERVICE**

NOW COMES the undersigned on behalf of Defendants and hereby accepts service of process of the civil summons issued on August 13, 2025, and the Complaint filed on August 13, 2025, (the "Lawsuit") pursuant to Rule 4(d) of the North Carolina Rules of Civil Procedure directed to Defendants for the above-captioned matter. The undersigned accepts service of process for all Defendants effective **August 25, 2025**, and acknowledges that such acceptance shall have the same force and effect as would exist had the process been served by personal delivery of copy of the Summons and Complaint upon the Defendants.

The undersigned represents that he is authorized to accept service of process for Defendants; that he/she received a copy of the Lawsuit; and that service of the Lawsuit has been accomplished on the Defendants in compliance with Rule 4 of the North Carolina Rules of Civil Procedure.

This the 28th day of August 2025.

CRANFILL SUMNER LLP

BY: _____
Jake W. Stewart, NC Bar No. 51157
*Attorney for Defendants*

P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
jstewart@cshlaw.com

4914-5893-3604, v. 1

# CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the attached *Acceptance of Service* on all of the parties to this cause by:

☐     Hand delivering a copy hereof to the attorney for each said party addressed as follows:

☐     Depositing a copy hereof, postage prepaid, in the United States Mail, addressed to the attorney for each said party as follows:

☐     Depositing a copy hereof with a nationally recognized overnight courier service, for overnight delivery, addressed to the attorney for each said party as follows:

☒     Electronic mail, addressed to the attorney for each said party as follows:

| | |
|---|---|
| Michael L. Littlejohn, Jr.<br>*Attorney for Plaintiffs*<br>227 W. 4th Street<br>Charlotte, NC 28202<br>Telephone: (704) 332-4581<br>Facsimile: (704) 625-9396<br>Email: mll@littlejohn-law.com | Justin Ramey<br>Attorney for Plaintiffs<br>P.O. Box 1462<br>Newton, NC 28658<br>Telephone: (828) 382-8229<br>Facsimile: (980) 243-7066<br>Email: justin@jrameylaw.com |
| M. Anthony Burts II<br>Kathryn Roseman<br>*Attorneys for Plaintiffs*<br>P.O. Box 102<br>Newton, NC 28658<br>Telephone: (704) 751-0455<br>Facsimile: (704) 413-3882<br>Email: anthony@burtslaw.com<br>Email: katie@burtslaw.com | |

This the 28th day of August 2025.

CRANFILL SUMNER LLP

BY: _____
Jake W. Stewart, NC Bar No. 51157

4914-5893-3604, v. 1

*Attorney for Defendants*
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
jstewart@cshlaw.com

4914-5893-3604, v. 1

CHARLOTTE NC LPC 281

2 SEP 2025 PM 05

FIRST-CLASS



US POSTAGE (M) PITNEY BOWES

ZIP 28211
02 7H
0006030618    AUG 28 2025

$ 000.74⁰

CRANFILL SUMNER LLP

ATTORNEYS AT LAW
PO BOX 30787
CHARLOTTE, NC 28230

RECEIVED SEP 0 5 2025

ATTENTION: _____JWS_____

28230-076767